**UNITED STATES of America, Plaintiff,**

**v.**

**Jose MALDONADO–ESPINOSA and Carmen Maldonado–Espinosa, Defendants.**

**Crim. No. 91–122(JAF).**

United States District Court,
D. Puerto Rico.

June 14, 1991.

José A. Quiles–Espinosa, Asst. U.S. Atty., Daniel F. López–Romo, U.S. Atty., District of Puerto Rico, San Juan, P.R., for plaintiff.

Juan R. Acevedo–Cruz, San Juan, P.R., for José.

Francisco Acevedo–Padilla, San Juan, P.R., for Carmen.

### OPINION AND ORDER

FUSTE, District Judge.

Defendants, José Maldonado–Espinosa and Carmen Maldonado–Espinosa, siblings, are charged with possession with the intent to distribute sixty (60) kilograms of cocaine found in suitcases which they checked as luggage aboard an American Airlines flight from San Juan, Puerto Rico, to Miami. Defendants seek to suppress the cocaine claiming that its discovery was the fruit of an illegal search. The government concedes that the search was warrantless, but seeks to justify the absence of a warrant on exceptions to the warrant rule: border

search or, alternatively, search conducted on consent (Mr. José Maldonado) and abandonment/disclaimer (Ms. Carmen Maldonado). We reject the border search theory outright and focus on the consent and abandonment. We must determine whether the outcome of an X-ray search of the luggage, which we find to be illegal, was "traded upon" by the law-enforcement officials in such a way so as to invalidate the consent of Mr. José Maldonado. We must determine whether the outcome of the X-ray search was traded upon in such a way as to coerce Ms. Carmen Maldonado's disclaimer.

### Facts

We cull the following facts from a full hearing held on the suppression motion.

On February 28, 1991, Customs Officer Raúl Díaz was conducting a training session with a drug detection dog named "Hershel" at Luis Muñoz Marín International Airport in Carolina, Puerto Rico. The training session consisted of Officer Díaz placing dummy luggage along with actual passenger luggage on conveyor belts within the airport. The dummy luggage was packed with narcotics as a "plant". Díaz would then bring Hershel into proximity with the "plant" so that Hershel could be trained in "alerting" to the presence of contraband narcotics. Hershel, a 1986 graduate of the K–9 training center in Virginia, has been in service in Puerto Rico since 1988 and has successfully certified for accuracy on an annual basis since then. A utilization record, put into evidence, is kept on all of Hershel's "alerts". Officer Díaz has been the sole "handler" of Hershel since the dog began its career.

The particular training session of interest to us was being conducted in an interior area of the airport, but not in the confines of the Customs area. Luggage on the particular conveyor belt had already been checked in for travel, and was headed for a location where it would be segregated by flight into small "carts" or containers which would then be taken to the appropriate airplane for loading. The belt contained luggage bound for both domestic and international destinations, each bag already marked from the check-in point as to its final destination.

At some time around Noon, Hershel alerted to two hardshell suitcases, neither of which were the prearranged plants, but which appeared to be actual passenger luggage. Officer Díaz contacted his superiors, Inspectors Justiniano and Hurtado. Officer Díaz was ordered to take the bags to the United States Department of Agriculture/Customs enclave. The bags were then subjected to an X-ray search which revealed several kilo-shaped packages, and the absence of clothing or other usual luggage contents. Officer Díaz was ordered to return to the conveyor belt to continue searching. Hershel alerted to two more bags, which were then brought to USDA/Customs, and subjected to an X-ray, which revealed the same presence of kilo-shaped packages and absence of other contents.

Inspector Hurtado examined the name and destination tags on the luggage, and determined that two of the bags carried the name "Rafael Colón" and two carried the name "F. Castro". The tags indicated that the luggage was headed to Miami on a particular American Airlines flight scheduled to depart at 1:50 that afternoon. At approximately 12:45 p.m., Inspector Hurtado left the Customs area, went to the gate from which the flight was scheduled to depart. He inquired of airline personnel, asking whether they could identify passengers "Castro" and "Colón". The gate agent told Hurtado that she could, and that she remembered the couple because of a slightly strange occurrence during check-in. Although the two clearly appeared to the flight agent to be travelling together, they had turned down the agent's offer to seat them together. The flight agent then pointed out to Hurtado the area in the waiting room where defendants had seated themselves.

When Hurtado approached, only the woman was there. He was in uniform, and asked to see her plane ticket. She told him that her brother had the ticket, and that he

was in the men's room. Hurtado asked if she would be willing to show him (Hurtado) the restroom where her brother had gone, and she agreed. The brother was coming out of the restroom when Hurtado arrived. Hurtado asked to see the tickets for the flight. The brother informed Hurtado that he did not have the tickets, that instead a "man in a yellow shirt" had them. No yellow-shirt man carrying the tickets could be located after a search of the concourse area. Hurtado asked whether the two would accompany him to the Customs area. They assented.

In the Customs area each was placed in a separate room. A patdown for weapons was conducted on each, and no weapons were found. Special Agent Rodolfo Salcedo read each a copy of the Miranda warnings in Spanish, and obtained a written waiver of their rights. Defendants revealed their real names. At some point defendants were handcuffed to the chair in their respective rooms. Supervisor Special Customs agent Benjamín García arrived. He asked Ms. Carmen Maldonado for the tickets. She used her free hand to reach into the carry-on bag and produced them. An inspection of the tickets revealed that they contained no baggage claim stubs. Agent Garcia then ordered Inspector Nidia Alvarez to search the carry-on bag. At that time the claim stubs for the four bags were found.

By mid-afternoon, approximately 3:00 p.m., Drug Enforcement Agent Enrique Nieves had arrived. Mr. José Maldonado was in the interview room along with the two brown suitcases bearing the name "Rafael Colón", the name under which Mr. José Maldonado was travelling. Ms. Carmen Maldonado was in the interview room along with the two grey suitcases bearing the name "F. Castro." Agent Nieves identified himself to Mr. José Maldonado, read him the Miranda warnings again, and began to discuss Mr. José Maldonado's situation. Nieves explained that the dog had alerted to the bags. He explained that the bags had been run through an X-ray machine and that kilo-shaped packages had been discovered. He told Mr. José Maldo-nado that in his experience, such packages contained cocaine. He told Mr. José Maldonado that the suitcase contained what he believed were a large quantity of drugs. He told Mr. José Maldonado that there were two options. Either Nieves could obtain a search warrant, which he would obtain on the basis of the information that he already had, or Mr. José Maldonado could consent to the opening of the bags.

Past the point at which Nieves informed Mr. José Maldonado of his options, the testimonies of the witnesses diverge. Mr. José Maldonado testified that Nieves produced a printed consent-to-search form that Mr. José Maldonado refused to sign. According to Mr. José Maldonado, Nieves then asked for oral consent, and Mr. José Maldonado refused. Nieves went on to have the suitcase opened anyway.

Nieves testified that he did not seek a written consent to search Mr. José Maldonado's luggage, since a verbal consent was sufficient. Although he was familiar with the written consent forms which were sometimes used on such occasions, he did not have one available that day. Nieves testified that in his four years as an agent assigned to the airport he had never had an occasion to request a search warrant.

On his direct examination, Nieves testified that after describing Mr. José Maldonado's "options", he asked whether these were Mr. José Maldonado's bags and whether he could open them. Nieves testified that Mr. José Maldonado gestured positively and assented verbally.

The court later recalled Mr. Nieves in order to go into greater detail regarding the precise exchange that took place with regard to the consent. This time, Nieves testified that he asked Mr. José Maldonado if these were his suitcases, and that Mr. José Maldonado acknowledged, that he nodded, and that he said yes. Nieves asked if Nieves could open the suitcases, and that it would be done in Mr. José Maldonado's presence. Nieves testified that Mr. José Maldonado hesitated. Nieves asked again, and told Mr. José Maldonado that they were going to open the suitcases either with consent or a warrant. Nieves testi-

fied that at that point Mr. José Maldonado said yes and gestured affirmatively. Nieves then ordered Díaz to open the suitcases, which was accomplished with a knife, since the cases were locked.

We give no weight to Mr. José Maldonado's testimony, since we find it not credible. Mr. José Maldonado admitted that he lied to Hurtado in the concourse regarding the tickets and the "man in the yellow shirt" as a way to, as he described it, buy time so he could figure out what was going on. This evidence of a willingness to blatantly lie to officials combined with Mr. José Maldonado's demeanor while testifying leads us to find him a wholly-incredible witness.

Nieves' testimony on the consent of Mr. José Maldonado was fairly consistent, and was supported by all the other agents on the scene. We find that Mr. José Maldonado consented verbally, affirmatively, and in a not ambiguous manner to the opening of the suitcases bearing his alias.

We leave for the body of the opinion the question of whether the consent given by Mr. José Maldonado was given voluntarily, or was the product of the illegal X-ray search.

The testimony regarding Ms. Carmen Maldonado was less clear. From the defense side, Ms. Carmen Maldonado gave almost exactly the same testimony as her brother, including regarding a request by Nieves first for a written consent and then for oral consent, both of which Ms. Carmen Maldonado says she rejected. We find Ms. Maldonado not to be a credible witness. Her demeanor and her near verbatim recital of her brother's testimony leave us little choice but not to find her believable. We base our findings primarily on the government's witnesses. The one fact that she testified to which we found to be spontaneous and believable was that she was repeatedly told, prior to the opening of the suitcases, about the contraband-appearing packages and the apparently large volume of contraband contained within.

Nieves himself testified he told Ms. Carmen Maldonado about the results of the dog sniff and the X-rays. On direct examination he testified that on his request for oral consent, Ms. Carmen Maldonado said that the bags were not hers. Nieves testified that Ms. Carmen Maldonado told him that since they were not hers, Nieves could open them. He testified that he understood by her gestures what she meant. Special Agent Marilyn García, who witnessed the discussion, confirmed that Ms. Carmen Maldonado said that the suitcases were not hers, but contradicted Nieves on the point about whether Ms. Carmen Maldonado went on to actually consent. Agent García testified that Ms. Carmen Maldonado never actually verbally consented to the search, but that Agent García felt that in her opinion, Ms. Carmen Maldonado consented by gesture.

On cross-examination defendants pointed out to Nieves that in the testimony before the Grand Jury, Nieves had testified to the following regarding the consent:

> And I requested a similar consent from Ms. Maldonado. Again, there was a clarification as to the identity, the ownership of the suitcases. She accepted and consented to opening the suitcases.

(Defendants' Exh. 4, p. 4). Before the Grand Jury, then, Nieves did not refer to disclaimer or abandonment at all, but stated that Ms. Carmen Maldonado accepted ownership and affirmatively consented to the search.

In addition, defendants pointed out that in the arrest report filled out by Nieves, only a straightforward consent is mentioned, not the rejection of ownership claimed by Nieves at the hearing on suppression.

On the recall for clarification by the court, Nieves testified that upon reviewing his Grand Jury testimony, he now believed that what Ms. Carmen Maldonado had actually given was a combination of consent and abandonment. He admitted that it was difficult to remember what had occurred, but that the message he understood from her was "open them", and that he got that impression from both words and gestures, both a disclaimer of ownership and a consent to search that which was not hers anyway. He ended his testimony by stat-

ing that Ms. Carmen Maldonado was denying ownership, consenting to the search, and abandoning the bags at the same time.

Ultimately, we find that at least a disclaimer was made. At least to that extent, Agent Marilyn García and Agent Nieves support each other in testifying that Carmen Maldonado abandoned the bags. In addition, we note that at the hearing Carmen Maldonado continued to deny ownership of the bags, strengthening our finding that she made such a disclaimer on the day of her arrest.[1] We make no finding as to whether a consent followed the disclaimer, since the testimony on that point was vague and contradictory, and since the disclaimer obviates the need for us to reach the question as to consent. We go on later in the opinion to determine, looking at all the circumstances, including the effect of the prior X-ray, whether we can find the disclaimer to be voluntary, or whether it was the product of coercion.

### Border Search

■ The government seeks to characterize the various interferences with the defendants as part of border search activities, and to thereby enjoy the free reign for searching given to Customs officials in executing their duties in protection of the border. *United States v. Braks*, 842 F.2d 509 (1st Cir.1988) (degrees of suspicion required to conduct both routine and nonroutine border searches). We reject this proposition outright.

The government grounds its position on the fact that the conveyor belt in question carried both domestic and foreign luggage in what the government describes as a "jumble". The luggage was on the short "trip" that all luggage checked into the airport, both foreign and domestic, must take before being loaded onto planes. The luggage was not in a designated Customs area. The government admits that the luggage in this case was strictly domestic and

that it was marked as such by the destination tags attached to it. In fact, it was the identification on the luggage itself which lead the investigators to the *domestic* gate of American Airlines where they found the Maldonados.

The government's argument, it seems, would apply to any piece of luggage checked for flight to a domestic location at the Luis Muñoz Marín International Airport. According to the government's argument, any domestic luggage checked in San Juan could be searched without warrant under the border exception, since all such luggage, on its journey from curb to airplane, becomes mixed at some point with international luggage. In essence, the government considers any part of the airport where international luggage may be found to be the "border" for purposes of even suitcases known by the officials to be on a strictly domestic route. We find this position to be insupportable.

The government concedes, as it must, that a flight from San Juan to Miami is domestic, and that a person taking such a flight is engaged in domestic travel. The Supreme Court has rejected the concept that there is an "intermediate border" between Puerto Rico and the mainland for Fourth Amendment purposes. *Torres v. Puerto Rico*, 442 U.S. 465, 474, 99 S.Ct. 2425, 2431, 61 L.Ed.2d 1 (1979); *López López v. Aran*, 844 F.2d 898, 902 (1st Cir. 1988) (trip from Puerto Rico to the Continental United States is not an "entry" for immigration purposes). The government also concedes that the luggage, when interfered with for the first time (on the conveyor belt) was not within the Customs enclosure through which all foreign travellers must pass.

Instead of trying to argue that the defendants and their luggage were engaged in international travel, or that the luggage was located in the formal border area for Customs purposes, the government argues that the luggage, mixed with international

---

1. We assumed Carmen Maldonado's "standing" for purposes of granting the hearing on the basis of her control over the suitcases which was evidenced from the claim tags corresponding to her alias. As discussed in this opinion at pages 1191–1192, the distinction between a standing inquiry and a substantive Fourth Amendment analysis is often more confusing than instructive.

luggage, entered a zone that was the functional equivalent of the border area. It is the government's position, which we find to be legally erroneous, that luggage in this "extended" border area could be searched without a warrant just as if it was crossing the actual border itself, even though officials knew that the luggage was engaged in strictly domestic travel. As we will demonstrate, it is not enough to justify a warrantless search of luggage merely to show that the luggage was located in an area which might be defined as the elastic border.

In *United States v. Carter*, 760 F.2d 1568 (11th Cir.1985), the court upheld a warrantless search of a small airplane which landed on a deserted Florida airstrip. The plane had been picked up by Customs radar north of Bimini Island heading for Florida. It was not sending out a transponder signal and had filed no flight plan in the United States. After landing, the occupants of the plane fled the scene, and interfered with a Customs plane's attempt to land. Once the officials made it to the ground, the plane was still there but all persons were gone. The Customs officers searched the plane and obtained evidence which was admitted at trial. The court found the aircraft validly subject to a border search, although the airstrip was in the interior of the state. In so doing, the court set out the three elements necessary for a border search conducted at a location other than the border:

> A border search may be conducted away from the actual border if: (1) there is a reasonable certainty that the object of the search has just crossed the border, (2) the search takes place at the first practicable point after the border was crossed, and (3) there has been no time or opportunity for the object of the search to have changed materially since the time of the crossing.

*Carter*, 760 F.2d at 1576, *citing, United States v. Garcia*, 672 F.2d 1349, 1365–66 (11th Cir.1982); *United States v. Corral–Villavicencio*, 753 F.2d 785, 788 (9th Cir. 1985) (reasonable certainty that object

crossed border needed to justify extended border search).

Here the government concedes that the Customs officials knew that the suitcases were travelling in a strictly domestic context since they were checked in at San Juan on the way to Miami. Not only does this case fail to satisfy the "reasonable certainty of having crossed the border" test as set out in *Carter* and *Corral–Villavicencio*, it specifically negates that a border crossing occurred.

The government relies for support of its position on *United States v. Glaziou*, 402 F.2d 8 (2nd Cir.1968), *cert. denied*, 393 U.S. 1121, 89 S.Ct. 999, 22 L.Ed.2d 126 (1969). In *Glaziou* two French seamen were observed leaving an enclosed international pier area along the Brooklyn waterfront. The two continued on a public street. Customs officials on patrol along the waterfront stopped the seamen and asked for their seamen's identification cards. One of the officers noticed a bulge around the waist of one of the seamen, and grabbed at it. The bulge turned out to be heroin. The seaman sought to suppress the evidence as the fruit of an illegal search. The Court found that the street was a part of the "border area" for purposes of Customs investigation.

In *United States v. Ramos*, 645 F.2d 318 (5th Cir. Unit B 1981), a situation similar to the one in *Glaziou* arose. Ramos arrived in Miami on a flight from Bogotá, Colombia. He passed through Customs without incident. A short time later another passenger on the same plane was found to be carrying cocaine on her person along with documents indicating a connection to Ramos. Approximately thirty minutes after Ramos passed through Customs, Customs officials left the Customs enclosure and located Ramos. He was in the airport, having checked into the airport hotel, but apparently having not yet gone to his room. He was dressed the same and carried the same briefcase. The Customs officials asked him to return to the Customs area, to which he agreed. A routine patdown revealed cocaine packages taped to his body. The court upheld the procedure, finding that the two essential criteria were:

(1) The degree to which the traveler has been assimilated into the mainstream of domestic activity, and (2) whether the evidence preponderates that the contraband seized has actually crossed the border.

*Ramos,* 645 F.2d at 320. Since Ramos and his accoutrements did not appear to have suffered any alterations since he and they had actually passed from international territory, and he was still in the general airport area, the court found the facts to support the reach of Customs officials beyond their confined area. *See also, United States v. Ogueri,* 798 F.2d 452 (11th Cir. 1986) (defendant passed Customs in airport without incident, walked twenty yards into airport concourse, and was recalled for second search).

In all of these extended border cases, a common theme predominates. The facts must support the conclusion that Customs officials must have at least a reasonable suspicion that a package or person searched outside the confines of the border proper did actually cross the border. The facts in the case before us do not support such a conclusion, but rather preclude it as a possibility.

The so-called "checkpoint" cases offer the government no more support. The border patrol maintains permanent checkpoints on roads leading from the border at which a vehicle may be stopped and questioned briefly even if there is no reason to believe that the car contains illegal aliens. *United States v. Villamonte-Márquez,* 462 U.S. 579, 587, 103 S.Ct. 2573, 2579, 77 L.Ed.2d 22 (1983); *United States v. Martinez–Fuerte,* 428 U.S. 543, 96 S.Ct. 3074, 49 L.Ed.2d 1116 (1976) (fixed checkpoints for auto stops on highway leading from border). The occupants of the car may be required to prove their citizenship or other right to be in the country. *Martinez–Fuerte,* 428 U.S. at 558, 96 S.Ct. at 3083; *United States v. Brignoni–Ponce,* 422 U.S. 873, 95 S.Ct. 2574, 45 L.Ed.2d 607 (1975).

The officials may ask the occupants to explain suspicious circumstances. *United States v. Benítez,* 899 F.2d 995 (10th Cir. 1990); *United States v. Johnson,* 895 F.2d 693 (10th Cir.1990).

While it is true that the checkpoint cases "do not require a showing that the particular item or person searched has actually crossed the border," *Jasinski v. Adams,* 781 F.2d 843, 847 (11th Cir.1986), the "[p]ermissible search and seizure is more restricted in this context than in any other [border or expanded border] context." *Jasinski,* 781 F.2d at 847. The heightened ability to stop and inquire at checkpoints away from the border does not lessen the strictures on a vehicle or luggage search conducted there. Those searches still require the probable cause or consent which would be required for a vehicle search anywhere in the interior. All the checkpoint gives to Customs officials is the right to make stops and inquiries without any particularized suspicion at a point away from the border where they would ordinarily be prevented from doing so. If probable cause to search develops as a result of the stop and inquiry, the official is in no better or worse position than if the probable cause had arisen on a routine highway traffic violation stop elsewhere in the interior. *United States v. Ortiz,* 422 U.S. 891, 896–97, 95 S.Ct. 2585, 2588–89, 45 L.Ed.2d 623 (1975); *Benítez,* 899 F.2d at 998. *See California v. Acevedo,* — U.S. —, 111 S.Ct. 1982, 114 L.Ed.2d 619 (1991) (probable cause to search particular luggage within car falls within general automobile exigency exception to warrant requirement). Therefore, while the checkpoint cases do provide an example where general screening for Customs purposes is allowed even absent a particularized suspicion that the border has been crossed, the checkpoint rationale allows for a very limited intrusion, and cannot possibly justify a warrantless search of a suitcase in an airport context.[2]

---

**2.** The Supreme Court has recently reaffirmed its position that law enforcement officers seeking to search luggage in an airport, although such luggage is itself movable, cannot rely on the same exigent circumstances exception to the warrant rule as has been applied to automobiles. *Acevedo,* — U.S. at —, 111 S.Ct. at 1985.

We find that the extended border search rationale is completely inapposite to the case at bar. The cases show that the doctrine does not simply extend the Customs enclosure a certain number of feet or yards into other areas of an airport, and thereby justify all standard border procedures to all persons or packages found within that radius. Rather, the court is required on the facts of each case to determine whether there is a reasonable certainty that the person or container involved has crossed the border or may do so in the immediate future.[3]

Since the procedure taken in this case cannot be justified on the basis of any border search exception, we go on to examine the proceedings of February 2, 1991 with reference to non-border doctrine.

### Dog Sniff

The entire scenario was triggered by the dog sniff of defendants' luggage. The Fourth Amendment "protects people from unreasonable government intrusions into their legitimate expectation of privacy." *United States v. Chadwick*, 433 U.S. 1, 7, 97 S.Ct. 2476, 2481, 53 L.Ed.2d 538 (1977). A person possesses a privacy interest in personal luggage. *Id.* at 13, 97 S.Ct. at 2484–85. Exposing luggage to a trained narcotics dog, however, has been held not to be a "search" within the meaning of the Fourth Amendment. *United States v. Sokolow*, 490 U.S. 1, 109 S.Ct. 1581, 104 L.Ed.2d 1 (1989) (dog sniff test used as probable cause to obtain warrant to open luggage); *United States v. Jacobsen*, 466 U.S. 109, 104 S.Ct. 1652, 80 L.Ed.2d 85 (1984) (dicta affirms that *Place* held that sniff test not a search); *United States v. Place*, 462 U.S. 696, 707, 103 S.Ct. 2637, 2644–45, 77 L.Ed.2d 110 (1983); *United States v. Osvaldo Rodríguez–Morales*, 929 F.2d 780, (1st Cir.1991) (dog sniff of automobile not a search); *United States v. LaFrance*, 879 F.2d 1 (1st Cir.1989) (canine sniff of Federal Express package not a search); *United States v. Sklar*, 721 F.Supp. 7 (D.Mass.1989) (dog sniff of Fed-

eral Express package); *United States v. Germosen–García*, 712 F.Supp. 862 (D.Kan.1989) (dog sniff of luggage at airport).

In *Place*, a traveller in an airport aroused the suspicions of law enforcement personnel. When they approached the suspect, that suspicion increased, on the basis of statements made by the suspect. Still, full-blown probable cause to arrest had not yet developed. Acting only on reasonable suspicion, the law enforcement personnel seized the luggage which belonged to the suspect long enough to subject it to a canine-sniff test. The test indicated the presence of illegal narcotics. The bag was then held until a warrant could be obtained. The Court held that the seizure of the bag on no more than reasonable suspicion in order to perform the sniff test could be justified under *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), which allowed police officers to make a short detention and frisk of a person on the street on less than probable cause so long as the police had a reasonable, articulable suspicion that criminal activity was afoot. *Terry*, 392 U.S. at 22, 88 S.Ct. at 1880–81.

The Court in *Place*, having found justification for the temporary seizure of the luggage, then held that the canine sniff of the detained bag, although it did impart to the police information about the contents, was not a search since it was so minimally intrusive. The Court pointed out that the sniff did not require the actual opening of the bag, and would not expose noncontraband items to public view. *Place*, 462 U.S. at 707, 103 S.Ct. at 2644–45.

There is precedent to the effect that although the *Place* court held that subjecting the luggage to a sniff is not a search within the Fourth Amendment, it must still be preceded by at least an individualized reasonable suspicion regarding the particular luggage involved. In *Place* itself, as in many of its progeny, the Court had to find articulable reasonable suspicion prior to the sniff since those cases involved a *detention*

---

**3.** We take no position on whether luggage marked for foreign destinations found in the same area as the luggage in this case could be returned to the border enclosure and subjected to a border search.

of the luggage *in order for* the dog sniff to be conducted. Those courts did not face the question of whether the dog sniff can be conducted randomly, with no particularized suspicion, where circumstances allow such sniffing with no interference with the luggage or the luggage's owner. Our situation is just such a case, since the dog, sniffing along luggage on a conveyor belt, alerted before any action was taken against the bag at all. As the Eighth Circuit phrased the issue: "[I]f we assume that a canine sniff is performed in such a manner that no detention whatsoever of the luggage were required, would the Fourth Amendment demand that *any* prior suspicion exist that the luggage may have contained contraband?" *United States v. Beale,* 731 F.2d 590 (8th Cir.1983). The Eighth Circuit concluded that prior suspicion regarding the particular piece of luggage would be required. We choose not to follow that holding.

First, there is nothing in *Place* itself which militates in the direction taken by the Eighth Circuit. The *Place* Court's concern regarding the suspicion necessary to "*Terry*-stop" the luggage was clearly directed at whether that *detention* was justified. The Court did not have before it the question of a suspicionless dog sniff.

■ Second, it would appear that our Circuit sanctions random dog sniffing of the type performed here. In *United States v. Race,* 529 F.2d 12, 14, n. 2 (1st Cir.1976), a Customs agent with a drug detection dog was randomly inspecting an American Airlines warehouse where domestic and international cargo was located at Logan Airport when the dog alerted to crates later found to contain marijuana. The First Circuit found nothing impermissible about the suspicionless sniffing. As the court stated "[w]e can discern no fourth amendment issue in the use of a dog for a routine check of commingled international and domestic freight in an airport warehouse." *Race,* 529 F.2d at 14, n. 2.

In *United States v. Quinn,* 815 F.2d 153 (1st Cir.1987), on the other hand, the court wrote that "[t]o be entitled to use a dog for purposes of making a sniff test, the offi-cers were required merely to have had 'reasonable suspicion' that the car contained narcotics...." (Citing to *Place*).

We think *Race* survives *Quinn* and applies directly to the case at bar. In *Race,* the driving factor in the case appears to have been that the Customs agent was legitimately canvassing the area due to the presence of international luggage. Such a scenario supplants the need for particularized suspicion as referred to in *Quinn.*

That the general requirement of particularized suspicion can be supplanted has been revisited recently. In *United States v. Rodríguez–Morales,* 929 F.2d 780 (1st Cir.1991), the First Circuit, referring to both *Quinn* and *Race,* held that the canine sniff of the exterior of an automobile already legitimately within the custody of the police was acceptable. The *Rodríguez* court held that "[s]o long as the automobile is lawfully impounded, the canine sniff test can be performed without any showing of reasonable suspicion." Like *Race,* then, the *Rodríguez* court found extenuating circumstances (that the car was already in police custody) that would obviate the need for particularized suspicion prior to the use of a sniffing dog.

We note that at least one circuit has read *Place* in such a way as to do away almost entirely with the need for particularized suspicion prior to dog sniffs. *United States v. Morales–Zamora,* 914 F.2d 200 (10th Cir.1990). In *Morales–Zamora,* dogs alerted to an auto stopped by police at a roadblock. While the court upheld that procedure, it specifically noted that random dog sniffs at stop lights, or dogs roaming the streets might require a different result.

We hold that the random sniffing in this case, as in *Race,* was legal. Our holding is limited. We take no position on random dog sniffing in contexts other than the specific situation which we face today: random sniffing of airport luggage in areas not frequented by the public that contain both domestic and international luggage. Were the luggage strictly domestic, were the sniffing done randomly in and around the public concourse area of the terminal, or were any of the other factors different,

we might hold differently. We do not intend to sanction, for instance, the random greeting of passengers at the airport curbside by uniformed officials with sniffing, growling teams of german shepherds, since such procedures would surely trigger other concerns. *Horton v. Goose Creek Independent School District,* 690 F.2d 470 (5th Cir.1982), *cert. denied,* 463 U.S. 1207, 103 S.Ct. 3536, 77 L.Ed.2d 1387 (1983) (pre-*Place* holding that large dogs sniffing school children is an unreasonable search).

### X-ray of Luggage

 Following the identification of the bags by the dog, they were taken to the Customs Area and run through an X-ray machine, at which point the kilo-shaped packages indicating the presence of cocaine were observed.

The ubiquitous warrantless airport X-ray is a search for purposes of the Fourth Amendment. It is justified as an administrative procedure, an exception to the warrant rule tolerated as necessary to insure safety in air travel. *United States v. $124,570 U.S. Currency,* 873 F.2d 1240 (9th Cir.1989); *United States v. Herzbrun,* 723 F.2d 773 (11th Cir.1984); *United States v. Albarado,* 495 F.2d 799 (2nd Cir.1974); *United States v. Davis,* 482 F.2d 893 (9th Cir.1973).

As set out by the seminal *Davis* case, *supra,*

> Screening searches of airline passengers are conducted as part of a general regulatory scheme in furtherance of an administrative purpose, namely, to prevent the carrying of weapons or explosives aboard aircraft, and thereby to prevent hijacking. The essential purpose of the scheme is not to detect weapons or explosives or to apprehend those who carry them, but to deter persons carrying such material from seeking to board at all.

*Davis,* 482 F.2d at 908.

In practice, security personnel,[4] acting pursuant to federal regulations, (14 C.F.R. § 108.9 (1988)) have the right to submit every piece of luggage destined to enter an airplane to an X-ray search. *U.S. Currency,* 873 F.2d at 1242. Any indication on the X-ray screen that the luggage contains something which appears to be dangerous to the flight, or which cannot be identified as harmless, renders the luggage subject to a full hand search until the object can be positively identified as harmless. *Herzbrun,* 723 F.2d at 777, *citing to United States v. Clay,* 638 F.2d 889 (5th Cir. Unit B), *cert. denied,* 451 U.S. 917, 101 S.Ct. 1996, 68 L.Ed.2d 310 (1981).

It has long been recognized that in the course of conducting a justified administrative search, screeners may uncover contraband completely unrelated to the purposes for which the administrative search was conducted, and such contraband can be admitted against the person in court. *Abel v. United States,* 362 U.S. 217, 80 S.Ct. 683, 4 L.Ed.2d 668 (1960).

It has *as* long been recognized that the danger exists that police will exploit the administrative search exception to engage in general contraband searches, and in that way circumvent the usual strictures of the Fourth Amendment. *Abel,* 362 U.S. at 230, 80 S.Ct. at 692–93. In *Davis,* the court warned of the fear "that the screening of passengers and their carry-on luggage for weapons and explosives will be subverted into a general search for evidence of crime." *Davis,* 482 F.2d at 909. As the Ninth Circuit put it, "[t]he risk that administrative searches will be infected by general law enforcement objectives, and the concomitant need for the courts to maintain vigilance, is a recurrent theme in our cases and those of other courts." *U.S. Currency,* 873 F.2d at 1244, *citing to United States v. Pulido–Baquerizo,* 800 F.2d 899, 902 (9th Cir.1986) ("a visual inspection and limited hand search of luggage which is used for the purpose of detecting weapons or explosive, and not in order to uncover other types of contraband is a privacy intrusion we believe free society is willing to tolerate"); *United States v. Epperson,* 454

---

4. *Davis* also held that airport security personnel perform a governmental purpose which constitutes state action.

F.2d 769, 771 (4th Cir.), *cert. denied,* 406 U.S. 947, 92 S.Ct. 2050, 32 L.Ed.2d 334 (1972) ("the search for the sole purpose of discovering weapons and precriminal events, fully justified the minimal invasion of personal privacy by magnometer").

In *U.S. Currency,* Customs had set up a system at the Seattle airport in which Customs would pay screeners who conducted the weapons safety check on domestic passengers and luggage a $250 bonus for discovery of sums of currency in excess of $10,000. The court suppressed a load of currency[5] discovered during the course of that process. The court noted that the screeners have broad discretion to determine the depth of their inquiry into a given piece of luggage, and that the incentive to search for non-weapon evidence of crime in order to win a reward would result in far more rigorous and intrusive searches than actually necessary to fulfill the administrative objective. "It effectively transforms a limited check for weapons and explosives into a general search for evidence of crime." *U.S. Currency,* 873 F.2d at 1247.

Therefore, we see that the airport X-ray cases do not sanction a general right to X-ray any bag found in the airport to uncover the evidence of criminal activity. Airport X-ray searches enjoy their administrative exception to the warrant rule only so far as they are conducted to further the compelling administrative purpose of keeping weapons and other items dangerous to flight off the aircraft. *U.S. Currency,* 873 F.2d at 1244.

In our case, the government does not even urge that an administrative objective was to be served by the search. The X-ray was conducted purely to confirm and clarify the existence of drug contraband in the suitcases already identified by the dog. The administrative search rationale is completely inapposite and may not be relied on here.

### On the Horizon

Although we recognize that it is not the current state of the law, we must note that it is the heartfelt conviction of this court

that where an administrative search regime is in place and sanctioned by the courts as truly necessary to fulfill an important governmental purpose, the lowering of privacy expectations resultant from that procedure should justify general, non-administrative searches of persons and personal effects already subject to the administrative search. The non-administrative searches would have to be no more intrusive than the sanctioned administrative procedure already in place. A passenger who goes to the airport, already facing an administrative X-ray search, cannot in any meaningful way be said to retain a reasonable expectation that his or her privacy will not be invaded at least to the degree of the minimally intrusive procedure of an X-ray. *Katz v. United States,* 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967) (seminal case explaining privacy interest).

We think most people who fly expect, while packing, that the bags they pack may well be open to public view once at the airport. An instrument as innocuous as a hair dryer may trigger a publicly viewed hand search, which is perfectly legal. It seems to us a pure abstraction to assert that a person retains a "privacy interest" in a bag as to one type of search, but not another. Once the interior of luggage must be opened to scrutiny for the administrative purpose, the privacy interest in the contents as therein packed seems to us irrevocably lost.

We would not advocate that positive evidence of crime culled from any warrantless X-ray would then justify a full-scale warrantless search. Instead, it would merely provide the probable cause for the bag to be held and the warrant to be obtained. In that way our proposed warrantless contraband search procedure would be no more intrusive, and tread no more deeply into reasonable privacy expectations that the administrative search already sanctioned. So long as the courts carefully police the areas deemed ripe for administrative searches to be certain that the police does not expand them only to amplify general

---

**5.** Other subsequent fruits of the currency dis- covery were also suppressed.

law enforcement purposes, then those areas in which administrative searches will lower privacy interests and allow for the searches discussed here will not unduly proliferate. In short, we find it not unreasonable to imagine the future adoption of a doctrine which holds that privacy expectations, once lowered by legitimately required administrative searches, are not suddenly regained because a new searcher approaches the luggage with a different purpose.

But that is not the current state of the law. The X-ray of defendants' luggage was completed in contravention of the Fourth Amendment. We move on to determine whether the fruit of this illegality (the information drawn from the X-ray screen) tainted any of the later evidence discoveries which defendants seek to suppress.

### Probable Cause to Arrest

■ Defendants concede that they cooperated voluntarily with the officials during the concourse/gate area discussions, and that they went to the Customs area of their own volition. Shortly thereafter, however, defendants were handcuffed to the chairs in their respective rooms and were read the Miranda warnings. We find that a full custodial arrest began at that point. Even ignoring the information gained from the X-ray, we believe that the arrests were supported by probable cause. *United States v. Russell,* 919 F.2d 795 (1st Cir.1990) (listing of First Circuit probable cause cases).

In dicta in *Florida v. Royer,* 460 U.S. 491, 506, 103 S.Ct. 1319, 1329, 75 L.Ed.2d 229 (1983), the Supreme Court, suggesting that the government should have submitted a particular piece of luggage to a dog sniff, stated that "a positive result [an alert by the dog] would have resulted in [the suspect's] justifiable arrest on probable cause." *United States v. Knox,* 839 F.2d 285, 294, n. 4 (6th Cir.1988) ("We would point out that, under *Royer,* the positive reaction of the Narcotics Unit dog alone

would have established probable cause to not only search defendants' luggage, but to arrest them immediately"),[6] *cert. denied,* 490 U.S. 1019, 109 S.Ct. 1742, 104 L.Ed.2d 179 (1988). In *Race,* the First Circuit found that probable cause to arrest was proven with evidence of a strong alert by a narcotics dog, evidence that the dog was reliable, and evidence linking the container to the individual arrested. The Ninth Circuit has emphasized the requirement that where the government seeks to show probable cause by means of a dog sniff alone, there must be a showing of the reliability of the particular dog in question. *United States v. Fernández,* 772 F.2d 495, 498, n. 2 (9th Cir.1985); *United States v. Spetz,* 721 F.2d 1457 (9th Cir.1983).

In our case, all aspects of probable cause on a dog sniff were proven. The dog alerted to the bags. The airline personnel pointed out the defendants as the individuals with the same names as the identification tags on the luggage. At the hearing before this court the government produced evidence of the dog's training and reliability, including records of his "alerts" over a substantial period.

Although we would find the dog sniff alone to be sufficient, we have more in this case. Added to the dog sniff we also have the suspicious behavior of the defendants which surely heightened the belief by the law officers that the defendants were engaged in illegal activity. First, the airline flight agent thought it strange that although they were travelling together, the man turned down an offer that they be seated together on the plane. Second, defendants could not produce the airplane tickets for the flight which they were about to take, and fabricated a story about a "man in a yellow shirt." While these phenomena on their own would be proof of almost nothing, added to the positive dog alert they heighten the probability that defendants had undertaken a course of action which they were trying to conceal.

---

**6.** Several First Circuit cases have found probable cause to seize a package long enough to get a warrant on the basis of a dog sniff. *United States v. Giannetta,* 909 F.2d 571 (1st Cir.1990); *United States v. LaFrance,* 879 F.2d 1 (1st Cir. 1989).

### Carry-on Bag Search

■ A small carry-on within Ms. Carmen Maldonado's immediate reach was searched, revealing the four luggage stubs which corresponded to the luggage at issue in this case.[7] Since we have found that the arrest was based on probable cause, we find that that search for evidence of crime was validly incident to the lawful arrest. *United States v. Robinson*, 414 U.S. 218, 94 S.Ct. 467, 38 L.Ed.2d 427 (1973); *Chimel v. California*, 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969).

Although we find the search legal, we must discuss and dismiss the government's attempt to portray the search for the claim tags as a part of a valid "security search". Agent García testified that when he arrived at the scene he obtained the plane tickets, but that the baggage stubs were missing. Although the defendants had already been subjected to a security check (a fact which García says he did not know, though it would have been against policy to leave defendants in the rooms without conducting such a check) he ordered that Inspector Alvarez conduct a "security check for weapons" on the carry-on bag within Ms. Carmen Maldonado's control. Inspector Alvarez complied, and produced the baggage stubs.

It is hard to imagine a clearer example of a pretextual search. García sent Alvarez into the bag in order to find the missing bag tags, clear and simple. Even if the order to make a security check had been made with a security purpose legitimately in mind, the seizure of four small tags of paper would never be justifiable as a by-product of a mere security check. A security check of a suspect being detained only on reasonable suspicion, conducted in order to assure that the individual is not in possession of any objects which might be used offensively against the officer conducting the investigation, can never justify the seizure of evidence of the type taken here. *Terry, supra.* The security check rationale failing, only full probable cause prior to the

carry-on bag search was sufficient to legalize it, since "[i]t is axiomatic that an incident search may not precede an arrest and serve as part of its justification." *Sibron v. New York*, 392 U.S. 40, 88 S.Ct. 1889, 20 L.Ed.2d 917 (1968); *Smith v. Ohio*, 494 U.S. 541, 110 S.Ct. 1288, 108 L.Ed.2d 464 (1990).

### Mr. José Maldonado's Consent

Since we find as a matter of fact that Mr. José Maldonado gave consent to have the two suitcases bearing his alias opened, our only question is whether that consent was valid. We must determine whether, given the "totality of the circumstances," including in this case the fact that the results of an illegal search were made known to Maldonado, his consent can be found to be "voluntary." *Schneckloth v. Bustamonte*, 412 U.S. 218, 227, 93 S.Ct. 2041, 2047–48, 36 L.Ed.2d 854 (1973). Looked at in another way, we must determine whether the results of the X-ray, communicated to Mr. José Maldonado, influenced or coerced his consent in a manner that renders the consent a "fruit of the poisonous tree." *Wong Sun v. United States*, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963); W.R. La-Fave, *Search and Seizure, 2nd Ed.*, § 8.2(d) (discussing differing methods used by courts to handle effect of prior illegality on consent which follows).

■ The mere fact that police gain information from a prior illegality which sets them in the direction of seeking a particular consent is not enough to make the consent given an exploitation of the prior illegality. In *United States v. Carson*, 793 F.2d 1141 (10th Cir.), *cert. denied*, 479 U.S. 914, 107 S.Ct. 315, 93 L.Ed.2d 289 (1986), Carson was hunting doves. Possession of the doves was made illegal by migratory bird treaties. While Carson was out in the field hunting, a sheriff searched some closed containers left behind by Carson, and discovered recently-killed doves. The search went unnoticed by Carson. The sheriff left, but returned a short time later.

---

**7.** Since we find as a matter of fact that Carmen Maldonado voluntarily reached into the carry-on bag to produce the plane tickets themselves to Agent García, there is no question of an illegal search with regard to the plane tickets.

Without telling Carson of the prior illegal search, the sheriff asked for Carson's consent to search the containers, which was given. The Tenth Circuit held that the subsequent consent was voluntary, and that fact that it was *requested* by the sheriff only because of the information obtained in the first search did not make it any less voluntary. *Carson*, 793 F.2d at 1147. The court relied on *Wong Sun* for support, pointing out that evidence is not inadmissable solely because *but for* the illegality the evidence would not have come to light. *United States v. Sheppard*, 901 F.2d 1230 (5th Cir.1990); *United States v. Fike*, 449 F.2d 191 (5th Cir.1971). A consent voluntarily given whose only relationship to the prior illegal act is that the police would not have sought the consent but for the illegal search is "sufficiently distinguishable" from the prior illegality as to not render the second tainted by the first. *Wong Sun*, 371 U.S. at 487–88, 83 S.Ct. at 417–18; *Carson*, 793 F.2d at 1149. As stated in *Carson*, "[t]he police officers' reasons or basis for asking for defendant's consent is irrelevant to the 'exploitation' issue unless the manner in which the police officers request consent renders defendant's consent involuntary." *Carson*, 793 F.2d at 1149.

The "manner" in which the request may render the consent involuntary may include trading on the illegally-obtained information by informing the suspect of the results of the prior search. In *Carson*, the court was careful to point out that "Carson ... was not aware of the initial search ..." before he gave his consent to the second search. "There is no evidence in the record showing that the officers used information obtained in the prior illegal search to coerce Carson into consenting to the subsequent search. Carson waived his Fourth Amendment right by voluntarily consenting to a search, independent of the prior police activity of which he did not know." *Carson*, 793 F.2d at 1155.

In the case before us, Mr. José Maldonado was fully informed of the prior illegal search of his luggage. Agent Nieves testified to having specifically told Mr. José Maldonado, while seeking his consent, about the results of the X-ray, about the kilo-shaped packages that were observed, about how in his (Nieves') experience, packages of that shape contained cocaine. Nieves told Mr. José Maldonado that what had been observed looked like "a lot of drugs."

On the one hand this looks very much like the kind of coercion by the direct use of the illegally received information which could be characterized as an "exploitation" rendering the consent involuntary. On the other hand, the message conveyed was simply that the agents knew of the existence of drugs in the bag and that they would receive a search warrant if consent was denied. That message would have been the same even if the agents had only the dog alert at the time of the request for consent.

In *United States v. Race*, 529 F.2d 12 (1st Cir.1976), the First Circuit faced a similar dilemma. The intervention in that case began with a dog alert to a crate in an American Airlines warehouse. After the alert, the dog handler used a knife to penetrate the crate. After insertion into the side of the crate, the knife smelled of marijuana. When the owner came to pick up the crate, he was stopped and questioned. At first he would not respond to requests for his consent to search the package. The agents afforded him the opportunity to discuss the situation with a prosecutor. After an hour of relaxed discussion, during which the defendant articulately asked questions regarding the situation and was repeatedly told that he did not have to consent to the search, the defendant signed a written search consent.

The defendant later argued that the knife stab was an illegal search which rendered his later consent invalid. The Circuit assumed without deciding that the knife insertion was an illegal search but held that the consent was not the "fruit" of that search.

The prior alert by the specially trained dog to the two heavy crates from a border state provided sufficient cause to arrest the defendant and ample notice to

request his consent to search. That consent, once obtained, provided a means of coming at the evidence that was, in our view, "sufficiently distinguishable to be purged of the primary taint."

*Race*, 529 F.2d at 15.

Three factors make it difficult to use *Race* to determine the outcome of our case. First, in *Race* it is not made clear in the court's decision whether the defendant was ever told about the knife search at all. If he was not, there was no "coercion" for the same reasons as articulated by the *Carson* court.

Second, even if the *Race* defendant was told about the knife search, that procedure provided investigators with very little information that they didn't already have with the dog sniff. The knife insertion gave the police no indication, for instance, of the amount of contraband. There was little gleaned from the knife search that we can imagine would have influenced the defendant's decision to consent. In our case, on the other hand, Nieves emphasized to Mr. José Maldonado the fact that the actual packages of cocaine had been observed, and specifically referred to the large quantity of the apparent contraband.

Third, since the voluntariness of the search is determined by all the circumstances, the other circumstances surrounding the *Race* consent and that given by Mr. José Maldonado vary considerably. The defendant in *Race* was not formally under arrest. Mr. José Maldonado was handcuffed (or at least had been earlier in the day). The defendant in *Race* was repeatedly instructed of his right to refuse, Mr. José Maldonado was not. The defendant in *Race* engaged the prosecutor in an hourlong informed discussion of his rights prior to consent. Mr. José Maldonado consented with a single word and a shrug.

All factors considered, however, we find that the consent given by Mr. José Maldonado was voluntary and was not the result of "exploitation" of the prior illegality. Distilled to its essence, the message which Nieves gave Mr. José Maldonado was that the agents believed the bags contained drugs and that they could and would obtain a search warrant if consent was refused. It is the same message with or without the specifics about the X-ray. Although we cannot know if the agent's tone was more firm or his conviction more steady due to the heightened knowledge that the X-ray gave him, we do not think our determination should be based on subtle shadings of demeanor. We think that Mr. José Maldonado would have consented even if he was advised only of the dog sniff.

### Abandonment/Disclaimer

■ Ms. Carmen Maldonado disclaimed ownership of the two suitcases bearing her alias. First, we must determine whether the disclaimer divests her of any Fourth Amendment protected privacy interest. Second, we must determine whether the disclaimer was the product of the illegal X-ray search.

In *United States v. Miller*, 589 F.2d 1117 (1st Cir.1978), *cert. denied*, 440 U.S. 958, 99 S.Ct. 1499, 59 L.Ed.2d 771 (1979), DEA agents set four suitcases taken from defendant's car before defendant and asked for his consent to search them. The defendant denied both ownership and any knowledge of the owner of the bags. Three of the bags, already unlocked, were opened and revealed nothing. A fourth bag had a combination lock. The defendant agreed to open the lock, although he maintained that he was not the owner of the bag. The bag was searched and drugs were found. The First Circuit held that the combination of the disclaimer and the unlocking of the bag amounted to a consent-in-fact. The court wrote that "one who disclaims any interest in luggage thereby disclaims any concern about whether or not the contents of the luggage remain private." *Miller*, 589 F.2d at 1131.

The holding of *Miller* has been misread to be based on a lack of *standing*. LaFave, *Search and Seizure, 2nd Ed.*, § 11.-3(f), n. 285 (holding of *Miller* characterized as "no standing where defendant disclaimed interest in luggage which police had just removed from his care and for which defendant had supplied the combination"). Since the *Miller* court found that

the search was based on "consent-in-fact", it technically did not find a lack of standing, since no consent is needed where a person has no standing to challenge the search.

That said, however, we find the distinction between "no-standing'" and "consent-in-fact" in disclaimer cases not to be a useful one. The Supreme Court in *Rakas v. Illinois*, 439 U.S. 128, 138, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978), recognized that at times the standing inquiry must be abandoned and a "substantive Fourth Amendment" analysis employed instead. In *United States v. Hawkins*, 681 F.2d 1343, 1344 (11th Cir.), *cert. denied*, 459 U.S. 994, 103 S.Ct. 354, 74 L.Ed.2d 391 (1982), the court in a "disclaimer" case wrote that "a focus on 'standing' is not now the proper approach to the ultimate question. After *Rakas* [cite *supra*], the proper analysis proceeds directly to the substance of a defendant's Fourth Amendment claim...." In *United States v. McBean*, 861 F.2d 1570 (11th Cir.1988), another disclaimer of luggage case, the Eleventh Circuit reasserted its belief that *Rakas* requires a substantive Fourth Amendment application rather than a technical standing inquiry.

Whatever the name for the test, (standing or substantive Fourth Amendment), the threshold question in determining whether a person has a "constitutionally protected reasonable expectation of privacy," *Katz v. United States*, 389 U.S. 347, 360, 88 S.Ct. 507, 516, 19 L.Ed.2d 576 (1967), is the same: "has the individual manifested a subjective expectation of privacy in the object of the challenged search?" *California v. Ciraolo*, 476 U.S. 207, 211, 106 S.Ct. 1809, 1811, 90 L.Ed.2d 210 (1986).[8]

In *United States v. Tolbert*, 692 F.2d 1041 (6th Cir.1982), *cert. denied*, 464 U.S. 933, 104 S.Ct. 337, 78 L.Ed.2d 306 (1983), DEA agents stopped and questioned a woman in the Atlanta airport. The woman showed the agents a ticket to Chicago which contained a claim check. The agent noted the number of the check. The woman was allowed to proceed to Chicago. On arrival, she failed to pick up any luggage and headed straight for a cab. Agents in Chicago stopped her and asked for her ticket. The claim stub had been removed. The woman was detained, and the luggage corresponding to the baggage claim number recorded by the agent in Atlanta was retrieved. The woman denied ownership, and the bag was searched without a warrant. The court held that "Tolbert can hardly assert that she 'exhibited an actual (subjective) expectation of privacy' respecting the luggage when she specifically disclaimed ownership thereof." *Tolbert*, 692 F.2d at 1045; *accord, United States v. Knox*, 839 F.2d 285 (6th Cir.1988).

In *United States v. McBean*, 861 F.2d 1570 (11th Cir.1988), the court held that where the suspect disclaimed ownership of the suitcases found in the trunk of his car, and stated that he did not know who owned them, "not only did he fail to manifest a subjective expectation of privacy in the luggage and its contents, he affirmatively disavowed any such expectation." *McBean*, 861 F.2d at 1574, *accord, United States v. Rush*, 890 F.2d 45, 48 (7th Cir.1989) (no manifestation of privacy interest when individual carrying suitcase in train station denied ownership upon inquiry by police); *United States v. Carrasquillo*, 877 F.2d 73 (D.C.Cir.1989) (denial by train passenger that garment bag under his seat was his divested him of privacy interest at time of search). We hold that Ms. Carmen Maldonado failed to manifest any privacy interest in the luggage or the contents thereof, and in fact affirmatively disclaimed any such interest.

### Effect of X-ray on Disclaimer

■ An abandonment, or in this case disclaimer, can be deemed ineffective if it is the product of improper police conduct. In *United States v. Roman*, 849 F.2d 920 (5th Cir.1988), a passenger arrived in Texas airport for a domestic flight. Customs officials observed him check in two suitcases. The agents had some suspicion regarding the bags. The agents approached the bags

---

**8.** The second part of the inquiry, which we need not reach, is whether the "society is willing to recognize that expectation as reasonable." *Ciraolo*, 476 U.S. at 211, 106 S.Ct. at 1811.

and detected a soapy odor of the type used to mask marijuana. They X-rayed the bags out of view of Roman and without his knowledge. The X-ray was inconclusive. They then approached Roman, who repeatedly denied ownership of the bags. The bags were searched without a warrant; the drugs were found. Roman sought to suppress on the theory that the X-ray was illegal and therefore his disclaimer of ownership was the fruit of an illegal search.

The court assumed without deciding that the X-ray search was illegal, but it refused to find a nexus between the search and the disclaimer. The court noted that the X-ray was inconclusive, and that there was no evidence that Roman was ever told that the X-ray had been performed. The court pointed out that Roman was not being detained at the time of the disclaimer.

■ In our case, Agent Nieves described the X-ray search and its explicit results to Ms. Carmen Maldonado. He told her about the packages that had been viewed, and about the quantity of contraband that had been observed. During her own testimony she stated that all the agents throughout the course of the events prior to the disclaimer kept telling her of the large quantity of drugs in the suitcases, information which they presumably knew on account of the X-ray.

Still, we think the analysis applied to José applies equally well to Carmen. While the X-ray provided the police with more specific information than they had after the dog sniff, it did not alter the basic message given to Carmen Maldonado: the luggage contained contraband substance, and the agents were going to open the luggage either on consent or with a warrant. We see no reason to believe that the detail added by the X-ray "coerced" the disclaimer. Carmen Maldonado knew that the agents believed there were drugs in the bags checked under her alias, and she sought to assure the agents that the bags were not hers. No more is needed to justify this search.

### Conclusion

The motion of both defendants to suppress evidence is denied in all respects. But law enforcement officials should take no solace in today's decision. While we find these searches to be justified, we also find that the individuals involved in the operation leading to this prosecution are inadequately trained in legally acceptable investigative techniques. Customs officials familiar with procedures appropriate only in the border context are being called upon to perform general drug screening of domestic travel with little or no understanding as to the legal ramifications of their actions. They do not know what type of searches can be conducted, when, on whom, or on what. It is only a matter of time before a major bust operation will be thrown out on a suppression issue because the officials' untrained approach to search and seizure leaves another court with no choice but to throw out the evidence.

Testimony from the several law enforcement personnel that appeared before us, both Customs officials and drug enforcement agents, established that none of them had ever obtained a search warrant of any kind. It was not clear to us whether the officials are even well versed in the current procedures to obtain such a warrant.

We do not mean to suggest that law enforcement officials facing the wave of drug trafficking have an easy task. But professionalism in law enforcement requires that officers and agents be trained in evidence acquisition techniques which can be upheld in court. In the case before us, the simple matter of obtaining a search warrant based on the dog's sniff would have eliminated all the doubts and confusions through which we have had to sift to determine the validity of these searches. It would have avoided the possibility of suppression, which was very real in this case. It would have relieved busy drug enforcement personnel like Agent Nieves from the time consuming and uncomfortable experience of having to explain inconsistent and contradictory testimony in an effort to have a warrantless search deemed legal after the fact.

**1194**

In short, drug enforcement activities at Puerto Rico's international airport are on the increase. From what we have seen, the officials charged with that job have not been properly trained. They are not prepared to get warrants, and they do not understand the exceptions to the warrant rule which would justify warrantless searches. We hope that situation will be corrected in short order, and that this court will not again be forced to justify after the fact searches which could and should have been conducted in a manner which would have raised no questions of legality.

IT IS SO ORDERED.