UNITED STATES of America, Plaintiff,

v.

John DOE, aka Alberto Suarez, aka Roberto Milton Lafita, Defendant.

Crim. No. 91–216 (JP).

United States District Court, D. Puerto Rico.

Nov. 1, 1991.

Thomas Lincoln, San Juan, P.R., for plaintiff.

Carlos Pérez, Asst. U.S. Atty., Hato Rey, P.R., for defendant.

## OPINION AND ORDER

PIERAS, District Judge.

### I.  INTRODUCTION

The Court has before it defendant's Motion to Suppress both a statement made by

him while in official custody and contraband discovered as the result of an illegal search. A suppression hearing was held in this case before Magistrate Judge Justo Arenas on August 7, 1991, pursuant to a referral from this Court. Magistrate Arenas issued a Report and Recommendation—which defendant objects to on several grounds—in which he recommended that the motion should be denied and the evidence not suppressed. The Court hereby ADOPTS the Magistrate's Report and Recommendation and hereby DENIES defendant's Motion to Suppress.

The facts in this case are similar to those presented to the Honorable Judge José A. Fusté in *United States v. Maldonado–Espinosa,* 767 F.Supp. 1176 (1991), since the cases arise out of discoveries made during parallel United States Customs Service (hereinafter "Customs") operations. In *Maldonado–Espinosa,* a brother and sister were arrested and charged with possession with intent to distribute 60 kilograms of cocaine found in suitcases which they had checked as luggage aboard an American Airlines flight from San Juan, Puerto Rico, to Miami, Florida. Suspicion had been drawn to the suitcases when a dog trained to alert to the smell of narcotics had alerted to the suitcases while they moved along a conveyor belt during a Customs training session. The bags were then taken to a Department of Agriculture station at the airport where they were x-rayed. When this process revealed several suspiciously shaped packages in the bags, Customs agents, with the assistance of information from the airline, boarded the plane and, after a brief period of questioning designed to confirm the identity of the suspects, removed the suspects to a Customs area for interrogation.

Although Judge Fusté found that the warrantless x-ray search was illegal, he ruled that the defendants had no right to have the evidence suppressed because one of them had consented to the search and the other one, by claiming the luggage was not hers, had divested herself of any reasonable expectation of privacy in the bags. Nonetheless, given the questionable practices employed by the Customs Service, the court issued the following warning against the continued use of the tactics:

> The motion of both defendants to suppress evidence is denied in all respects. But law enforcement officials should take no solace in today's decision. While we find these searches to be justified, we also find that the individuals involved in the operation leading to this prosecution are inadequately trained in legally acceptable investigative techniques. Customs officials familiar with procedures appropriate only in the border context are being called upon to perform general drug screening of domestic travel with little or no understanding as to the legal ramifications of their actions. They do not know what type of searches can be conducted, when, on whom, or on what. It is only a matter of time before a major bust operation will be thrown out on a suppression issue because the officials' untrained approach to search and seizure leaves another court with no choice but to throw out the evidence.

*Maldonado–Espinosa,* 767 F.Supp. at 1193. The facts in the case now before this court arise out of an operation like that Judge Fusté warned against. Only because of defendant's lack of standing to object to the illegal conduct at issue here does the Court elect not to suppress the evidence here at issue.

## II. FACTUAL BACKGROUND

On May 22, 1991, Customs Officer Raúl Díaz was conducting a training session involving a canine unit named Herschel C–418 at the American Airlines Terminal at Luis Muñoz Marín International Airport in Carolina, Puerto Rico. During these sessions the officers place dummy bags, in which they insert narcotics, along side genuine checked baggage moving along a conveyor belt at the terminal. The canine unit, who is trained to alert to the smell of cocaine, heroin, marijuana, and hashish, is then tested to see if he can correctly alert to the tainted luggage. During this particular session, Herschel did alert to two bags—by scratching at their hides—but not the dummy bags. He instead alerted to

two items of checked luggage with claim tags bearing the name of Alberto Suárez.

Officer Díaz removed the luggage from the belt and turned them over to Senior Inspector Justiniano of the Customs Service Contraband Enforcement Team. Inspector Justiniano took the suitcases to the American Airlines customs area and called his supervisor, Special Agent Ben García, to inform him of the existence and location of the cases. He was directed by Agent García to follow certain "directives" which dictated that the bags be taken to a Department of Agriculture enclosure area for inspection.

Upon reaching the enclosure area, Inspector Justiniano informed Agriculture Inspector Carlos Caraballo of the dog alert and instructed him to check the bags in an x-ray machine. Upon calling for and receiving the approval of his supervisor, Inspector Caraballo put the bags through the machine. The test revealed dark spots inside both suitcases consistent with a series of rectangular packages piled on one another. Inspector Caraballo tried to open the cases, upon which he noticed worn Department of Agriculture stickers, but they were locked.[1] Inspector Justiniano unlocked the bags and opened them, finding the rectangular packages—20 in each suitcase weighing a total of 40 kilograms—wrapped in plastic bags. Since the items in the bags did not give rise to agriculture-related concerns, Inspector Caraballo handed the packages to Inspector Justiniano and left. Inspector Justiniano then conducted a field search on the material in the packages, one of which tested positively for cocaine.

Agent García arrived along with the Customs Analytical Unit, which had been summoned to identify the flight on which the bags were to leave and the passenger who had checked the bags. Upon obtaining this information, Inspector García and Inspector Richard Herman proceeded to the appropriate gate to board American Airlines Flight 411, which was to depart shortly, to

apprehend the suspect. Agent Justiniano testified that when Agent García arrived in the room where the field test had been conducted he was in such a hurry that although he saw the open suitcases he was not at that time informed that the field test had been conducted, nor, necessarily, of the results of the test. Agent García testified he apprehended the suspect based only on the dog alert. At the gate, Agent García and Inspector Herman were informed that an Alberto Suárez had boarded Flight 411 and was assigned seat 28D. When they arrived at seat 28D they asked the gentleman occupying the seat, the defendant, for his airline ticket, which he provided and which bore the name Alberto Suárez. Inspector Herman then asked the defendant his name, which he said was Alberto Suárez.[2] The Customs officials identified themselves to the defendant, established that he had no carry-on luggage, and ordered him to accompany them off the aircraft. Once off the aircraft, the defendant was subjected to a pat down search for weapons and identification, handcuffed, and taken to the Customs enclosure.

Agent García testified at the suppression hearing that during the walk to the Customs enclosure the defendant initiated a conversation with him, asking why he was being detained. The agent responded that a dog had alerted to several pieces of luggage. The defendant then asserted that he had no luggage. The agent showed him the airline ticket he had turned over with two baggage claim checks attached to it. The defendant claimed the ticket was not his—that he had purchased it from an individual at the airport, whom he believed he could identify, for half price. Agent García's testimony concerning these events at the preliminary hearing had been the same except for that he had not mentioned that the defendant had asked him any questions.

When they reached the Customs enclosure, the defendant was turned over to Customs Agent Salcedo for identification

---

1. Inspector Justiniano explained that Inspector Caraballo opened the suitcases because, being domestic packages, they could not be opened by Customs Inspector Justiniano himself.

2. The defendant's real name is apparently Roberto Milton Lafita.

and processing. Agent García instructed Agent Salcedo to read the defendant his *Miranda* rights, which he did. The defendant was presented with a form purporting to be both an acknowledgment and waiver, which he refused to sign, and asked for an attorney. At this time the defendant was handcuffed to a chair.

No testimony was presented by the defense at the suppression hearing. Instead, the defendant relied on the testimony of the government's witnesses.

When asked about the discrepancy between his testimony at the preliminary hearing and at the suppression hearing, Agent García explained that he simply "did not remember" at the preliminary hearing that the defendant had initiated a conversation with him. The Magistrate found Agent García's explanation of the discrepancy, and therefore also his testimony at the suppression hearing, credible. On this basis, the Magistrate found that the defendant's statements that he did not have any luggage were not the result of a custodial interrogation and therefore admissible. Having found the defendant's statement admissible, the Magistrate then found that it amounted to a disclaimer of his privacy interest in the luggage which left without standing have the evidence suppressed.

Defendant's Objection to the Magistrate's Report and Recommendation contained several individual exceptions to the findings therein; however, these exceptions can be grouped into two major objections. First, defendant argued that the Magistrate had prejudged the credibility of Agent García, whose testimony was not only central to the government's case, but, as noted above, inconsistent on a crucial point. Second, defendant entered what appears to be a kind of general objection to

the Magistrate's findings regarding the suppression of the evidence.[3]

## III. DISCUSSION

### A. Magistrate's Credibility Finding

The Court will not address defendant's first objection in any detail because it finds it meritless. Defendant has tried to fashion from incomplete quotations from the transcript of the suppression hearing a condition that simply did not exist at the hearing itself. Although Magistrate Arena's comments, as reflected in the transcript, might appear confusing, after reviewing his comments within their appropriate context the Court finds that the Magistrate did not prejudge the credibility of Agent García's testimony.

■ The defense has objected to Magistrate Arena's judgment of the credibility of Agent García on an additional ground, however. Magistrate Arenas suggested that *exculpatory* statements like that made by the defendant, who denied any ownership of the contraband, are not suppressed even if made as the result of a coercive custodial interrogation. The Court agrees with defendant that this is a misstatement of the law as stated in *Miranda* itself. *Accord Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). The defendant appears to suggest,[4] however, that Magistrate Arena's scrutiny of Agent García's testimony was somehow less exacting because of his misperception of the law. The Court does not agree. The record indicates that Magistrate Arenas made an independent judgment of the witnesses credibility, which this Court finds reasonable and supportable. The Court therefore moves on to discuss defendant's second objection.

---

**3.** Defendant's general objection derives from his objection to: (i) the Magistrate's failure to see the importance of *Maldonado–Espinosa* to this case (Defendant's Objections to Magistrate's Report and Recommendation at 15–16); (ii) the Magistrate's finding that the defendant disclaimed any interest in the luggage (*id.* at 17); (iii) the Magistrate's failure to admonish the government agents for their conduct in this case, specifically in failing to read the defendant

his *Miranda* rights at the appropriate time (*id.* at 17–18).

**4.** It is not entirely clear what defendant's assertion is on this issuer but the Court understands defendant's objection to be aimed at the prejudicial results of the Magistrate's misunderstanding of the law regarding exculpatory statements.

B. Magistrate's Search and Seizure Finding

1. Standard of Review

The motion to suppress in this case was referred to Magistrate Arenas pursuant to 28 U.S.C. § 636(b)(1)(B), which, when read in conjunction with 28 U.S.C. § 636(b)(1)(A), provides that a district court may refer motions to suppress to magistrates, who then may not enter a final determination on the matter but may make proposed findings of fact and recommendations. The parties then have 10 days to file objections to the magistrate's report. Section 636(b)(1) provides that after any objections have been filed:

> [a] judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate. The judge may also receive further evidence or recommit the matter to the magistrate with instructions.

28 U.S.C. § 636(b)(1).

▇▇▇▇ Defendant argues in his Objections that this court, in making a de novo determination, must conduct a new suppression hearing to judge the credibility of the witnesses and the weight of the evidence itself. This is incorrect. In conducting such a de novo review, the district court is directed only to review those portions of the transcript which relate to a party's specific objections regarding the magistrate's treatment of the evidence. *Accord Hill v. Duriron Co.*, 656 F.2d 1208, 1215 (6th Cir.1981). Where a party enters a general objection, the district court is to treat it as an objection to every part of the magistrate's report, which it must then review in its entirety. *Accord Willett v. Wells*, 469 F.Supp. 748 (E.D.Tenn.), *aff'd without op.*, 595 F.2d 1227 (6th Cir.1979).

Since the Court, as mentioned above, views defendant's objections as in part embodying a general objection to the Magistrate's findings regarding the suppression of the evidence, the Court is required to review the entire transcript of the proceeding in making its determination. The Court has conducted such a review, having read the entire transcript and studied it in great detail. Based on this review, the Court makes the following findings.

2. Search

The government has never argued that the x-ray and physical searches conducted in this case were not illegal. The Magistrate discussed each search in detail and concluded that these two were in fact illegal. The Court agrees that the searches were illegal, but nonetheless feels the need to review the legality of each search to illustrate just how abhorrent the government's conduct is in this case and cases like it.

a. *Dog Sniff*

▇▇▇▇ All searches and seizures by government agents are controlled by the fourth amendment,[5] which "protects people from unreasonable government intrusions into their legitimate expectations of privacy." *United States v. Chadwick*, 433 U.S. 1, 7, 97 S.Ct. 2476, 2481, 53 L.Ed.2d 538 (1977). A "search" has been defined as a governmental intrusion into infringement of an individual's privacy. *See Rakas v. Illinois*, 439 U.S. 128, 140–49, 99 S.Ct. 421, 428–33, 58 L.Ed.2d 387 (1978), *reh'g denied*, 439 U.S. 1122, 99 S.Ct. 1035, 59 L.Ed.2d 83 (1979). Therefore, the degree of intrusiveness involved in government action is relevant in determining whether a search has occurred. In *United States v. Place*, 462 U.S. 696, 103 S.Ct. 2637, 77 L.Ed.2d 110 (1983), the Supreme Court stated that a "canine sniff" by a trained narcotics dog was perhaps the least intrusive type of search they had ever come across. It does not require the opening of luggage.

---

5. The fourth amendment provides:
   The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.
   U.S. Const. Amend. IV.

It does not expose items that would otherwise be hidden from public view. And the information it seeks is exceedingly narrow—whether the item does or does not have a aroma of narcotics. *Id.* at 707, 103 S.Ct. at 2644. The Court therefore held that exposure of an individual's luggage located in a public place to a trained canine does not in any fashion constitute a "search" within the meaning of the fourth amendment.[6] *Id.; see also United States v. Sokolow,* 490 U.S. 1, 109 S.Ct. 1581, 104 L.Ed.2d 1 (1989) (canine sniff may be used as probable cause to obtain warrant to search luggage); *United States v. Rodriguez–Morales,* 929 F.2d 780 (1st Cir.1991) (dog sniff of automobile does not constitute a search); *United States v. La France,* 879 F.2d 1 (1st Cir.1989) (canine sniff of Federal Express package does not constitute a search).[7] Given these precedents, the Court finds that no constitutional interests were offended by the canine sniff by Herschel C–418 in this case.

### b. *X–Ray Search*

Use of an x-ray machine, or magnetometer, to divine the contents of a closed bag, on the other hand, *is* a search for purposes of the fourth amendment. *Accord United States v. Epperson,* 454 F.2d 769 (4th Cir.), *cert. denied,* 406 U.S. 947, 92 S.Ct. 2050, 32 L.Ed.2d 334 (1972) (use of x-ray machine is a "search" within the meaning of the fourth amendment since machine's very purpose is to discover presence of metals in areas where there is normally an expectation of privacy). Therefore, any information derived from such a search where the search is conducted without a warrant or under one of the grounds for warrantless searches would be obtained in violation of the fourth amendment.

**6.** In *Place,* the Court noted that some reasonable suspicion was required to legitimize the government's action—the seizure of defendant's luggage, the resulting detention of the defendant, and the canine sniff of his luggage. This suspicion was required because of the seizure of the bag and detention of the defendant, however, under the principles of *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). Where, as here, neither the defendant nor his possessions

In an airport or border context, however, certain types of x-ray searches are considered consensual "administrative" searches, for which no warrant is required. One example is the common x-ray search of a passenger's luggage or person which is intended "to prevent the carrying of weapons or explosives aboard aircraft." *United States v. Davis,* 482 F.2d 893, 908 (9th Cir.1973); *see also United States v. $124,-570 U.S. Currency,* 873 F.2d 1240 (9th Cir.1989); 14 C.F.R. § 108.9 (1988) (regulation providing that all luggage taken onto an airplane may be subject to an X-ray search). Another example is searches pursuant to regulatory schemes meeting reasonable administrative standards.

Neither of these types of searches were being conducted in this case. The Customs official stated unequivocally that he directed that the bag be x-rayed to confirm the presence of drugs, not to search for weapons. And, although the government, in setting forth Inspector Caraballo's testimony regarding the worn USDA sticker on the luggage, made an anemic attempt to cast the search as being conducted under normal Agriculture operations, the Court believes, as the Magistrate did, that this was entirely a Customs operation and that the presence of Agriculture personnel and equipment is merely fortuitous. The warrantless x-ray search in this case was therefore not otherwise validated and therefore illegal.

### c. *Physical Search of Luggage*

Little need be said about the opening of the luggage and search of its contents. It was a search. It was carried out without a warrant. It was not carried out based on one of the well-established exceptions to the warrant requirement. It was, in short, an unqualifiedly illegal search.

were seized in order to conduct the search, no articulable suspicion is required. *See Maldonado–Espinosa,* 767 F.Supp. 1176, for further discussion of this issue.

**7.** For a more detailed discussion of case law regarding canine sniffs, *see Maldonado–Espinosa, supra.*

## C. Defendant's Right to Assert Illegality

The Magistrate similarly came to the conclusion that the x-ray and physical searches were illegal. In fact the Magistrate, like the court in *Maldonado–Espinosa*, felt that the procedures used in these types of cases are inherently illegal. He commented:

> I am sure that the legerdemain which is the subject of the Customs/Agriculture agreement will ultimately result in the suppression of evidence in this court. The application of the naive agreement is an affront to the fourth amendment.

Report and Recommendation at 6. The Magistrate concluded, however, that this defendant had no right to have this evidence suppressed in his trial because it was seized from luggage he denied owning or possessing. *Id.* (citations omitted).

Whether a defendant has a right to have evidence suppressed in his own trial in situations like this is a difficult question. It is hard even to know what to call the issue. The Supreme Court has, at various times, considered it one of standing (*see, e.g., Jones v. United States*, 362 U.S. 257, 80 S.Ct. 725, 4 L.Ed.2d 697 (1960)), of a defendant's reasonable expectation of freedom from governmental intrusion (*accord Mancusi v. DeForte*, 392 U.S. 364, 88 S.Ct. 2120, 20 L.Ed.2d 1154 (1968)), and of a defendant's legitimate expectation of privacy in the item searched (*accord Rawlings v. Kentucky*, 448 U.S. 98, 100 S.Ct. 2556, 65 L.Ed.2d 633 (1980). The Supreme Court has also noted that at times such theoretically-separated analyses should be abandoned in favor of a "substantive Fourth Amendment" analysis. *Rakas v. Illinois*, 439 U.S. 128, 138, 99 S.Ct. 421, 428, 58 L.Ed.2d 387 (1978).

Whatever the test is called, it seeks to determine whether the defendant's own constitutional rights have been violated such that he is the proper individual to challenge the government's conduct. *Ac-*cord *Rakas, supra; U.S. v. Salvucci*, 448 U.S. 83, 86–87, 100 S.Ct. 2547, 2550–51, 65 L.Ed.2d 619 (1980). To do so, a court is generally directed to ascertain whether the defendant manifested some subjective expectation of privacy in the object of the challenged search. *California v. Ciraolo*, 476 U.S. 207, 211, 106 S.Ct. 1809, 1811, 90 L.Ed.2d 210 (1986) (relying on *Katz v. United States*, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967). In a disclaimer context, the issue is whether the defendant has "voluntarily discarded, left behind, or otherwise relinquished his interest in the property in question so that he could no longer retain a reasonable expectation of privacy with regard to it at the time of the search." *United States v. Colbert*, 474 F.2d 174 (5th Cir.1973).

In this case, the defendant has never claimed that he in any way owned or possessed the luggage at issue or that he in some other way had a reasonable expectation of privacy in the items. On this basis, the Magistrate felt that he lacked standing to challenge the illegal searches. For various reasons, the Court *seriously* doubts the propriety of denying defendant's motion to suppress on these grounds.

First, if one looks at the facts in this case, and takes them in context with those in *Maldonado–Espinosa*, one can identify a very disturbing pattern. In both this case and *Maldonado–Espinosa*, Customs agents conducted illegal searches of checked luggage and found narcotics. Armed with this information, which all concede is illegally obtained, the Customs agents board the plane and apprehend their suspect. At this point in time they have evidence linking the suspect to crime and have confirmed the suspects identity. In short, they know well that they intend to arrest the suspect. They do not arrest him, however, and thereby avoid reading him his *Miranda* rights.[8] Then some sort of discussion ensues, either at the behest of

---

8. In addition, when they do read the defendant his *Miranda* rights, they then present him with a form that purports to be both an acknowledgment and waiver of those rights—a strategy that appears designed to have suspects unwittingly waive their rights when they only intend to acknowledge them.

the agents or the suspect. The suspect is told that luggage—which he must assume they believe is his—has been found with narcotics.

At this point he has three options. He can admit that the luggage is his. Of course, no suspect would do so because he would be admitting his guilt, and no suspect should be required to do so because of the fifth amendment's privilege against self-incrimination. Second, the suspect can remain silent. Given that the agents avoid reading the suspects their *Miranda* rights, it is unclear whether they understand that silence is an option. Even if they do, any reasonable person would understand that silence at this juncture would only raise additional suspicions. Therefore, the suspect is really only left with one viable option: deny ownership of the luggage.

Through this process, the Customs agents succeed, with the assistance of the information they obtained by violating the suspect's constitutional rights, in coercing the suspect to disclaim any interest in the luggage, thereby undermining his only recourse against the agents' conduct. These types of situations have long been recognized as one of the major failures of the standing approach. One commentator has noted:

> "Since the standing rule determines the suppression of evidence on the basis of the defendant's relation to the place, person, or thing searched, it is far too predictable to be effective in deterring police overreaching. The standing rule allows sophisticated law enforcers or their advisors to assess in advance the likelihood of their search being invalidated by the exclusionary rule. This advanced warning thereby furnishes them with relatively clear legal advice with which to plan unlawful searches calculated to yield a maximum amount of useful evidence and a minimum number of defendants with standing to object."

LeFave, *Search and Seizure* at 368 (2d ed. 1987) (quoting Note, 24 Stan.L.Rev. 947, 958 (1972).

Second, the facts of this case are significantly different from other disclaimer cases where the evidence is not suppressed. In all such cases the Court has reviewed, law enforcement officers obtained or were aware of the defendant's disclaimer of any interest in the item searched *before* they conducted any actual physical search. *See, e.g., United States v. Moskowitz*, 883 F.2d 1142 (2d Cir.1989) (defendant denied several times that bags were his and then FBI agent searched bags); *United States v. Tolbert*, 692 F.2d 1041 (6th Cir.1982) (defendant denied having any luggage and DEA agents subsequently opened suitcase suspected to be defendant's with key found in defendant's possession); *United States v. McBean*, 861 F.2d 1570 (11th Cir.1988) (search conducted after defendant stated that he knew nothing about ownership and contents of luggage found in his trunk). As a result, it could be easily shown in these cases that the officers were acting in good faith, believing the defendant's interests did not preclude them from searching the item at issue. The disclaimers acted to validate the search before it occurred.

In this case, the Customs agents did not act in good faith. There are no qualifications to the illegality of the searches they conducted. They are simply trying to use the defendants disclaimer as a back-door tactic to retroactively validate their actions.

The Court is therefore tempted to view the suppression in this case as having nothing to do with the defendant or his actions and instead reaching a decision solely based on the conduct of the government. The Court's underlying concerns are based on the following. In addition to deterring illicit police conduct, one of the major reasons for the exclusionary rule is the interest of judicial integrity. In *McNabb v. United States*, 318 U.S. 332, 345, 63 S.Ct. 608, 615, 87 L.Ed. 819 *reh'g denied*, 319 U.S. 784, 63 S.Ct. 1322, 87 L.Ed. 1727 (1943), the Supreme Court noted that evidence obtained through flagrant disregard for federal law "cannot be allowed to stand without making the courts themselves accomplices in willful disobedience of law." In *Elkins v. United States*, 364 U.S. 206, 223, 80 S.Ct. 1437, 1447, 4 L.Ed.2d 1669 (1960), the Court, quoting this

language, added that the courts should be even more hesitant to admit evidence obtained "in the willful disobedience of a Constitution they are sworn to uphold." These interests were cited by the Court in *Mapp v. Ohio*, 367 U.S. 643, 659, 81 S.Ct. 1684, 1693, 6 L.Ed.2d 1081 (1961), the case in which the Court extended the reach of the exclusionary rule to state courts.

Because of these concerns and the likelihood that such illegally obtained evidence will continue to come into the court until it is suppressed and Customs is *forced* reform its policies and procedures, the Court does not deny defendant's motion to suppress without some hesitation. Until evidence obtained through these procedures is suppressed, the courts of this district can issue all the warnings they please but such admonitions will likely have little effect.

However, the Court does suppress the evidence because of certain procedural difficulties, which fatally undermine the defendant's ability to have the evidence suppressed. The defendant has never asserted in this case that the luggage at issue was in fact his. Since his overall defense is based on a claim that the luggage is not his, and an admission of control or possession over the luggage at this stage would present a major inconsistency in his defense, this failure is somewhat understandable. It might appear that the defendant was caught in the unenviable position of having to waive his fifth amendment right against self-incrimination to obtain standing to object to violations of his fourth amendment right against unreasonable searches of his property. If the Court felt that the defendant was denied a meaningful opportunity to object to the government's illegal conduct it might have been willing to yield to temptation and decide this issue without looking at the defendant's position.

 The defendant's situation was not nearly so bleak, however. It has long been established that testimony given by a defendant in order to establish his standing to object to illegally seized evidence may not be used against him at his trial on the question of guilt or innocence. *Simmons*

*v. United States*, 390 U.S. 377, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968) (defendant should not be faced with choice of giving up valid fourth amendment claim or waiving fifth amendment privilege against self incrimination). The defendant therefore had a clear and easy opportunity to solve his standing problem in this case. Given that the defense failed to take advantage of this simple and well-known device, the defendant's standing argument rings hollow. The Court therefore has no choice but to allow the evidence and deny defendant's motion.

## IV. CONCLUSION

The defendant lacks standing to object to the searches conducted in this case; therefore, the Court denies the defendant's motion to suppress without reaching the substantive issues implicated by the illegal searches.

IT IS SO ORDERED.