UNITED STATES of America,
Plaintiff–Appellee,

v.

$124,570 U.S. CURRENCY, Defendant.

Appeal of Wayne G. CAMPBELL,
Claimant–Appellant.

No. 88–5527.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Dec. 5, 1988.

Decided April 24, 1989.

Paul L. Gabbert, Santa Monica, Cal., for claimant-appellant.

Dwight B. Moore, Asst. U.S. Atty., Civil Div., Los Angeles, Cal., for plaintiff-appellee.

Before POOLE, REINHARDT and KOZINSKI, Circuit Judges.

KOZINSKI, Circuit Judge:

Like more than a billion other airline passengers last year, Wayne G. Campbell passed through an airport security check on his way to a flight. During the course of the screening, the security officer discovered a large quantity of U.S. currency. Pursuant to an established arrangement, the officer notified agents of the United States Customs Service who paid her $250 for the tip. The tip led to Campbell's detention and confiscation of the currency.

Campbell challenges the legality of the search, raising fundamental questions about the extent to which law enforcement authorities may use airport security inspections to promote objectives unrelated to air safety.

I

On January 5, 1987, Campbell placed his locked briefcase on a conveyor belt leading through an x-ray scanner operated by United Airlines at the Seattle International Airport. Picking up a dark mass on the x-ray screen, the Flight Terminal Security (FTS) officer operating the scanner, Bonnie Boswell, asked Campbell to open the briefcase. First expressing reluctance, Campbell eventually agreed to do so privately, behind a screen. FTS officer Karen Kangas searched the case and found a very large quantity of currency. Kangas then questioned Campbell regarding his destination and eventually released him. Kangas returned the briefcase to Campbell, who proceeded to board United Airlines Flight 22 bound for Los Angeles.

FTS officers at the Seattle airport have a policy of reporting any sum of United States currency over $10,000 to the United States Customs Service and Airport Police.[1] Employees who report the discovery of such sums are paid $250 as a reward. Consistent with this policy, Kangas telephoned United States Customs Service Officer Steve Symms immediately after she released Campbell. Kangas gave Symms a description of Campbell, his briefcase and its contents, and his destination. Symms relayed this information to a customs agent at Los Angeles International Airport (LAX), who in turn informed Roger Guevarra, a Drug Enforcement Administration agent.

Acting on this information, Guevarra and a second DEA agent, Christopher Amato, met Campbell's flight and began following Campbell around the airport terminal building. After Campbell retrieved his suitcase and exited the building, the agents approached him and identified themselves as special agents of the DEA. In response to their questioning, Campbell admitted that

---

**1.** FTS officials are private law enforcement officers. Federal regulations require each airport and airplane operator to adopt and carry out a security program that meets federal standards. 14 CFR §§ 107.1–109.5 (1988). In discharging this responsibility, airports and airlines must train a corps of employees in special aviation security procedures, as well as in general law enforcement procedures consistent with the training standards set by the state and local jurisdictions in which the airport is located. These employees are then uniformed, armed with firearms and given arrest authority for violations of certain criminal laws. *Id.* § 107.17.

he had $130,000 in his briefcase, but contended that the money belonged to a friend of his in Encino who had hired him to ransom a stolen painting. Campbell further explained that he had traveled to Seattle to read books and visit friends, and had stayed with friends there. He had taken the money to Seattle with him because he was afraid to leave it at home. Campbell would not give the name and telephone number of the friend for whom he was ransoming the painting.

Skeptical of this story, the agents decided to take the briefcase to a nearby DEA office for further investigation. They advised Campbell that he was not under arrest and was free to go, but that they would be detaining his briefcase. Campbell decided to follow the agents to the DEA office. Once there, Amato asked Campbell to open the briefcase and told him that, should he refuse, the agents would attempt to obtain a search warrant.

Campbell opened the briefcase revealing bundles of currency in denominations between five and one hundred dollars. The agents also found a substantial quantity of cigarette rolling papers, and a receipt from a Seattle hotel indicating that Campbell had stayed there from January 3 to January 5, 1987.

The DEA agents photocopied the papers and returned to Campbell everything except the currency. On January 6, 1987, DEA agents used Smoky, a narcotics-detecting dog, to test the currency for the odor of cocaine, heroin, marijuana and marijuana derivatives. Smoky's reaction to the currency indicated that one or more of these substances had come in contact with one or more of the bills.

The United States then filed this civil forfeiture action pursuant to 21 U.S.C. § 881(a)(6) (1982). Campbell filed a timely claim and answer, and moved to suppress the evidence uncovered by the search of his briefcase. The district court denied Campbell's motion to suppress and ruled that the currency was subject to forfeiture. Campbell appeals the district court's rulings.

## II

Commercial air travel, once a luxury, has become a staple of modern existence. For many Americans, boarding an airplane to travel across the state or across the country is as ordinary and commonplace an event as boarding a bus or train fifty years ago, or mounting a horse-drawn carriage around the turn of the century. Students going home for the holidays, corporate executives traveling on business, grandmothers visiting their grandchildren, federal judges riding circuit: Airplane travel has become the lifeblood of American society in the latter part of the twentieth century. According to the Federal Aviation Administration, in 1987 there were 1,095,600,000 airline passengers, an average of more than four trips for very man, woman and child in the United States. *See* Office of Civil Aviation Security, Federal Aviation Administration, *Semiannual Report to Congress on the Effectiveness of the Civil Aviation Security Program July 1, 1987–December 31, 1987*, at exhibit 7 (1988); U.S. Dep't of Commerce, *Statistical Abstract of the United States* 7 (1988).

Along with the good comes the bad. While airline travel provides unparalleled speed, comfort and convenience to travelers who must cross vast distances in a short time, it also gives terrorists and other criminals a unique opportunity for inflicting death and destruction. Airplanes are peculiarly vulnerable to hijacking, as well as to attacks with firearms and explosives; airports, where large numbers of people congregate, can be attractive targets for terrorism. Aware of these dangers, Congress passed the Air Transportation Security Act of 1974, Pub.L. No. 93–366, 88 Stat. 415 (1974) (codified as amended in 49 U.S.C. App. §§ 1356, 1357, 1371, 1372, 1472, and 1516) (1982 & Supp. III 1985). The Act empowers the Administrator of the FAA to establish and monitor security procedures for preventing acts of criminal violence and aircraft piracy. The Administrator has promulgated regulations under the Act which, among other security measures, require all passengers and carry-on property to be screened by weapon-detecting security procedures. 14 C.F.R. § 108.9 (1988).

On the basis of 14 years' experience, we can say with some confidence that the Air Transportation Security Act has been a success. Airline hijackings and similar incidents are a rarity in the United States. The security system set up at airports throughout the country processes millions of passengers every day with relatively little delay or inconvenience. Aware of the system's life-saving purpose, Americans submit to metal detectors and x-ray devices without a second thought. The intrusion into our privacy—and an intrusion it surely is—is accepted by most travelers with

equanimity. *See* Bennet, *Six–Million–Dollar Man,* New Republic, Jan. 23, 1989, at 18.

The unavoidable consequence of this exhaustive search for weapons is that security personnel will become aware of many personal items that do not pose a danger to air safety. X-rays reveal, in outline, the contents of packages, often giving a good indication as to their inventory. When packages are opened, or when pockets are emptied, FTS agents will see many items that are considered private.

Normally, the intrusion is small. Materials other than weapons and explosives are usually ignored by FTS personnel; the disclosure has no permanent consequences and the passenger is able to regain his privacy in the anonymous throngs of a busy airport. Not so, however, when FTS officials single out a particular passenger on account of the contents of his pocket or briefcase. At that point the intrusion becomes more permanent, the invasion of privacy more severe.

■ It is, moreover, an intrusion not automatically covered by the logic of the Air Transportation Safety Act. While narrowly defined searches for guns and explosives are constitutional as justified by the need for air traffic safety, *United States v. Davis,* 482 F.2d 893, 910 (9th Cir.1973), a generalized law enforcement search of all passengers as a condition for boarding a commercial aircraft would plainly be unconstitutional. Here we must consider whether the use of the airport security screening system to achieve ends unrelated to air safety violates the constitutional rights of commercial air travelers.

■ A. We start with the fundamental proposition that "except in certain carefully defined classes of cases, a search of private property without proper consent is 'unreasonable' unless it has been authorized by a valid search warrant." *Camara v. Municipal Court,* 387 U.S. 523, 528–29, 87 S.Ct. 1727, 1731, 18 L.Ed.2d 930 (1967). *See also Stoner v. California,* 376 U.S. 483, 486, 84 S.Ct. 889, 891, 11 L.Ed.2d 856 (1964); *United States v. Jeffers,* 342 U.S. 48, 51, 72 S.Ct. 93, 95, 96 L.Ed. 59 (1951),

*rev'd on other grounds by Rakas v. Illinois,* 439 U.S. 128, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978). Among the "carefully defined classes of cases" for which no warrant is needed are administrative searches, that is, searches "conducted as part of a general regulatory scheme in furtherance of an administrative purpose, rather than as part of a criminal investigation to secure evidence of crime." *United States v. Davis,* 482 F.2d at 908. In *Davis,* we approved warrantless airport security checks as administrative searches, relying on *Camara, United States v. Biswell,* 406 U.S. 311, 92 S.Ct. 1593, 32 L.Ed.2d 87 (1972), and *Wyman v. James,* 400 U.S. 309, 91 S.Ct. 381, 27 L.Ed.2d 408 (1971). In approving the searches under this theory, we noted that the governmental interest in assuring air traffic safety is compelling while the intrusion into the privacy of passengers is as limited "as is consistent with the satisfaction of the administrative need that justifies it." *Davis,* 482 F.2d at 910.

Judge Browning's thoughtful and narrowly crafted opinion in *Davis* made it clear, however, that we were not placing our imprimatur on all airport searches, so long as they could colorably be classified as serving a security purpose. Quite the contrary. We recognized in *Davis* that administrative searches, like all other governmental searches,[2] are subject to the fourth amendment's reasonableness requirement. To the extent that administrative searches are used for purposes other than those contemplated by the regulatory scheme, they may fall outside the rationale by virtue of which we have approved them. Specifically, in *Davis* we recognized the danger that "the screening of passengers and their carry-on luggage for weapons and explosives will be subverted into a general search for evidence of crime." *Id.* at 909. Should that danger materialize, we noted, we would not hesitate to exclude the evidence so obtained. *Id. Accord United States v. Politano,* 491 F.Supp. 456 (W.D. N.Y.1980); *United States v. Scott,* 406 F.Supp. 443, 444–45 (E.D.Mich.1976); *United States v. Mitchell,* 352 F.Supp. 38, 43 (E.D.N.Y.1972), *aff'd mem.,* 486 F.2d 1397 (2d Cir.1973) (stating that evidence uncovered by warrantless searches tainted by impermissible investigatory motives must be suppressed).

---

**2.** *Davis* also held that, although FTS officers are not government employees, their activities are sufficiently imbued with a governmental pur-

pose that the searches constitute state action. 482 F.2d at 904. *See* note 1 *supra.*

The risk that administrative searches will be infected by general law enforcement objectives, and the concomitant need for the courts to maintain vigilance, is a recurrent theme in our cases and those of other courts. In *United States v. Schafer*, 461 F.2d 856 (9th Cir.), *cert. denied*, 409 U.S. 881, 93 S.Ct. 211, 34 L.Ed.2d 136 (1972), for example, we upheld the admission of evidence inadvertently discovered during a routine agricultural quarantine search, but were careful to note that "[n]othing in the record suggests that the administrative search in this case was 'employed as an instrument of criminal law enforcement to circumvent the latter's legal restrictions....'" *Id.* at 859 (quoting *Abel v. United States*, 362 U.S. 217, 230, 80 S.Ct. 683, 692, 4 L.Ed.2d 668 (1960)). *See also United States v. Pulido–Baquerizo*, 800 F.2d 899, 902 (9th Cir.1986) (holding that "a visual inspection and limited hand search of luggage which is used for the purpose of detecting weapons or explosives, and *not in order to uncover other types of contraband*, is a privacy intrusion we believe free society is willing to tolerate") (emphasis added); *United States v. Epperson*, 454 F.2d 769, 771 (4th Cir.), *cert. denied*, 406 U.S. 947, 92 S.Ct. 2050, 32 L.Ed.2d 334 (1972) ("the search for the sole purpose of discovering weapons and preventing air piracy, and not for the purpose of discovering weapons and precriminal events, fully justified the minimal invasion of personal privacy by magnetometer").

The Supreme Court has repeatedly emphasized the importance of keeping criminal investigatory motives from coloring administrative searches. In *Camara*, the Supreme Court approved administrative searches as reasonable because "the inspections are neither personal in nature nor aimed at the discovery of evidence of crime, [and therefore] involve a relatively limited invasion of the urban citizen's privacy." 387 U.S. at 537, 87 S.Ct. at 1735. In *Wyman v. James*, 400 U.S. at 323, 91 S.Ct. at 389, the Court upheld the legality of a program requiring home visits by caseworkers as a condition for welfare assistance in part because "[t]he home visit is not a criminal investigation, does not

equate with a criminal investigation, and ... is not in aid of any criminal proceeding." In *Abel v. United States*, 362 U.S. 217, 80 S.Ct. 683, 4 L.Ed.2d 668 (1960), the Court held that evidence uncovered by a search incident to an arrest on an administrative warrant for deportation was admissible in court, but cautioned:

We emphasize again that our view of the matter would be totally different had the evidence established ... that the administrative warrant was here employed as an instrument of criminal law enforcement to circumvent the latter's legal restrictions, rather than as a bona fide preliminary step in a deportation proceeding. The test is whether the decision to proceed administratively toward deportation was influenced by, and was carried out for, a purpose of amassing evidence in the prosecution for crime.

*Id.* at 230, 80 S.Ct. at 692.

 The concerns, expressed in this circuit and elsewhere, that administrative searches not become a tool for law enforcement, reflect the limited rationale supporting those searches. To sustain a warrantless search, a court must normally make a case-specific factual determination that an exception to the warrant requirement (e.g. exigent circumstances, plain view) is applicable. If the search is approved, the approval covers that case only. An administrative search is different. By approving a warrantless search under this rationale, a court places its stamp of approval on an entire class of similar searches. Because it must consider the general, long-term implications of approving a new type of administrative search, the court will focus on legislative facts—those applicable to the entire class of cases—rather than adjudicative facts—those applicable only to the case before it. The court then relies on these legislative facts to make a dual determination: (1) that the search serves a narrow but compelling administrative objective, *see, e.g., Camara v. Municipal Court*, 387 U.S. 523, 536–37, 87 S.Ct. 1727, 1734–35, 18 L.Ed.2d 930 (1967); and (2) that the intrusion is as "limited ... as is consistent with

satisfaction of the administrative need that justifies [it]." *Davis*, 482 F.2d at 910.

■ Once a type of search has been approved under this rationale, the court is freed from the need to make a specific factual inquiry in every subsequent case. In later cases, the search is deemed proper if it is covered by the approved rationale. By the same token, the court cannot sustain a subsequent search that differs in material respects from the search initially approved, as the same legislative facts may not be applicable.

■ In *Davis*, we approved airport security searches based on the understanding that they would be limited to searches for guns or explosives, and that they would be no more burdensome than necessary to achieve that objective. So long as the government officials conducting the searches pursue a single-minded objective—air safety—the rationale of *Davis* works well: the searches will, almost by definition, be no more intrusive than is necessary to achieve air safety. Not so where FTS officials have other objectives in mind. We can then no longer rely on the same legislative facts that underlay the search we approved in *Davis*.

The situation at Seattle Airport plainly falls outside the administrative search rationale approved in *Davis*. According to the agreed facts,[3] there is an established working relationship between FTS personnel and other law enforcement officials at that airport. The FTS has a policy of encouraging agents to report the presence of "drugs and U.S. currency" to the U.S. Customs and Port Police and to "work hand-in-hand with [them] regarding detection and reporting of [such items]." Motion to Suppress at 6. The cooperation is made palpable by the fact that FTS officers are paid a substantial monetary reward for alerting law enforcement authorities of the identity of passengers carrying large sums of currency and, presumably, contraband or other evidence of crime.

■ This close working relationship between the FTS and law enforcement authorities has a significant distorting effect on airport searches as approved in *Davis*, materially altering the calculus by which we held such warrantless searches reasonable. The desire to cooperate with law enforcement authorities, encouraged by FTS policy and fueled by the hope for a reward, may well affect the actions of FTS agents in ways that were not contemplated or approved in *Davis*.

FTS officers have very broad latitude in deciding how deeply to probe in their search for weapons or explosives. For example, the officers must make the initial decision whether to manually search a piece of luggage after it has been scanned by x-rays. If the officers have only one objective—detecting firearms and explosives—we can safely defer to their judgment, as they would have no reason to open packages unless they contained something potentially dangerous. It is much different where the agents have a dual objective; the decision to open a particular briefcase may be motivated by the desire to comply with the FTS's cooperation policy. Particularly zealous FTS agents may choose to open packages more often, hoping to improve their chances of earning a

---

**3.** The government stipulated to the facts presented in pages six through eight of the defendant's motion to suppress evidence. Reporter's Transcript of Proceedings at 6–8, *United States v. $124,570.00 U.S. Currency*, No. CV–87–578–RSWL (C.D.Cal. Nov. 13, 1987). This section stated, in part:

FTS has a policy of reporting any sum of U.S. currency over the amount of $10,000 to U.S. Customs and the Port Police. The security personnel work for United Airlines pursuant to the Air Piracy Act (49 U.S.C. § 1356 *et seq.*). The security personnel are encouraged by U.S. Customs Agents and Port Police to report large sums of money to them. The airport security personnel work hand-in-hand with U.S. Customs and Port Police regarding the detection and reporting of drugs and U.S. currency.

. . . .

Kangas and Boswell received $250 each from Customs Agent Symms as a reward, bounty or moiety for violating Campbell's legitimate expectation of privacy in the non-contraband contents of his briefcase.

Notice of Motion and Non–Statutory Motion to Suppress Evidence [Motion to Suppress] at 6–7, *United States v. $124,570.00 U.S. Currency*, No. CV–87–578–RSWL (C.D.Cal. Nov. 13, 1987).

reward. In short, the policy of "work[ing] hand-in-hand with U.S. Customs and Port Police regarding the detection and reporting of drugs and U.S. currency" will very likely influence FTS officers to conduct more searches, and more intrusive searches, than if they focus on air safety alone.

The case before us illustrates this point. After Campbell opened his briefcase and revealed the large quantity of currency, FTS agent Kangas "questioned [Campbell] and determined that he was taking a domestic flight to Los Angeles." Motion to Suppress at 7. Having found no weapons or explosives in Campbell's bag, agent Kangas's legitimate interest in Campbell's identity and destination were at an end; there was no further safety-related justification for detaining Campbell and prying into his affairs. Quite obviously, agent Kangas found herself hot on the trail of a reward and was doing what she could to help law enforcement authorities identify Campbell.

■ Aside from the direct effect on those passengers who are subject to the more intrusive searches, the cooperation between FTS personnel and law enforcement authorities may also have an adverse effect on other air travelers. To the extent FTS personnel devote time, energy and attention to achieving objectives other than air safety, their effectiveness in carrying out responsibilities under the Airport Transportation Security Act may be impaired. Here, for example, even assuming that the decision to select Campbell for a manual inspection was legitimate, agents Boswell and Kangas spent more time dealing with him, and later with the customs agents, than if their interest had been limited to air safety. It is possible, of course, that in searching for contraband, FTS agents will find weapons or explosives. But this diversion of resources may also unnecessarily delay the flow of traffic through security checkpoints [4] and distract FTS agents from the goals of the Air Transportation Security Act. We have no way of knowing the precise effect of the arrangement at the Seattle Airport on any particular search. And that's the problem: having determined that a material new variable has been introduced into the process, we can no longer rely on the legislative facts that underlay our approval of security checks as administrative searches in *Davis*.[5]

■ We cannot fault law enforcement officials for focusing on airport security searches as a source of information regarding criminal activities. The task they face is enormous and important; a sieve through which pass the contents of billions of satchels, purses, briefcases and pockets will naturally strain out much that is of interest to law enforcement. *See Davis*, 482 F.2d at 908. But it is the very ubiquitousness of airport security checks that calls for the greatest vigilance on our part. Because these checks touch the lives of so many, because they have become such an accepted part of our existence, they are capable of great abuse. Liberty—the freedom from unwarranted intrusion by government—is as easily lost through insistent nibbles by government officials who seek to do their jobs too well as by those whose purpose it is to oppress; the piranha can be as deadly as the shark.[6]

---

4. The burden on the travelling public from delays caused by airport security checks can be substantial. *See* Bennet, p. 1242, *supra*.

5. In light of *Davis*, we must reject *United States v. Smith*, 643 F.2d 942 (2d Cir.), *cert. denied*, 454 U.S. 875, 102 S.Ct. 350, 70 L.Ed.2d 182 (1981), holding that an airport search instigated by the DEA was constitutional so long as "'there was an independent and adequate basis for the security search in its own right.'" 643 F.2d at 944 (quoting *United States v. Scott*, 406 F.Supp. 443, 445 (E.D.Mich.1976)). As we noted in *Davis*, a search remains a valid administrative search only so long as the scope of the search is permissibly narrow; once a search is conducted for

a criminal investigatory purpose, it can no longer be justified under an administrative search rationale.

6. Nothing we say should discourage FTS agents from acting diligently, even zealously, in conducting legitimate searches for weapons and explosives. Considering the tragic consequences that flow from terrorist acts, FTS agents screening passengers and their carry-on luggage should conscientiously investigate any circumstances that arouse their suspicions. So long as the agents' attention is focused on the limited objective of uncovering deadly devices, any search they conduct would fall within the rationale of *Davis*, even if a more thorough

■ The accommodation reached between law enforcement authorities and FTS officials at the Seattle airport no doubt makes much sense from a law enforcement perspective. Too much sense. It effectively transforms a limited check for weapons and explosives into a general search for evidence of crime. This substantially erodes the privacy rights of passengers who travel through the system. "No one can serve two masters," we are told. *Matthew* 6:24. A limited administrative search cannot also serve unrelated law enforcement purposes. To the extent that Campbell was identified by FTS officials and reported to customs agents pursuant to an established policy of encouraging such reporting, the search can no longer be justified as an administrative search on the basis approved by us in *Davis*.[7]

B. Because we cannot uphold the search under the rationale of *United States v. Davis*, we must next consider whether it may be justified under any other exception to the warrant requirement.

■ We have already determined that an airport screening system cannot be justified as a limited search for weapons under *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). *Davis*, 482 F.2d at 905–08. Nor can we uphold the search, as the government would have us do, on the basis of consent. There is some sense, we suppose, in which it could be said that Campbell consented to the search that led up to the discovery of the currency by FTS agents. But the scope of the consent is perforce limited by the nature of the search to which the subject submits. Passengers rushing to board a plane can fairly be said to have consented to a search for weapons and explosives; any such devices found in their possession are fair game for seizure. But passengers would be surprised to learn that they are also submitting to a more generalized search for contraband or, broader yet, things that are not in themselves illegal but merely look suspicious.

We are reluctant to hold that the consent given for airport security searches exceeds the rationale of those searches. Indeed, we doubt that the government could extract so broad a consent as a condition for boarding an airplane. As Professor La-Fave notes, should the government decide to screen all passengers on trains, buses or cars, such a procedure could not be upheld on grounds of implied consent, in the absence of a constitutionally sufficient justification. Any other conclusion "not only offends common sense, but flies in the face of the most fundamental Fourth Amendment principle that the government cannot 'avoid the restrictions of the Fourth Amendment by notifying the public that all telephone lines would be tapped or that all homes would be searched.'" 4 W. LaFave, *Search and Seizure* § 10.6(g) (2d ed. 1987)

---

search for weapons also has the effect of revealing more contraband.

7. *United States v. Canada*, 527 F.2d 1374 (9th Cir.1975), *cert. denied*, 429 U.S. 867, 97 S.Ct. 177, 50 L.Ed.2d 147 (1976), on which the government places substantial reliance, is not to the contrary. In *Canada* there was no indication of a cooperative relationship between FTS officers and law enforcement officials; there was no reward. Nothing we say today precludes FTS officers from reporting information pertaining to criminal activity, as would any citizen. We see the matter as materially different where the communication is undertaken pursuant to an established relationship, fostered by official policy, even more so where the communication is nurtured by payment of monetary rewards. The line we draw is a fine one but, we believe, one that has constitutional significance.

See *United States v. Hellman*, 556 F.2d 442 (9th Cir.1977); *United States v. Mitchell*, 458 F.2d 960 (9th Cir.1972); *United States v. Lipscomb*, 435 F.2d 795 (5th Cir.1970), *cert. denied*, 401 U.S. 980, 91 S.Ct. 1213, 28 L.Ed.2d 331 (1971) (upholding warrantless inventory searches of cars only so long as the inventorying was routine practice and not done for an investigatory police motive).

For the same reasons, we consider *United States v. Skipwith*, 482 F.2d 1272 (5th Cir.1973), inapposite. *Skipwith* refused to adopt a general rule that evidence of crime found in the course of an airport screening would be inadmissible. We, too, have declined to lay down any such general rule, and have held that evidence inadvertently discovered as part of a legitimate airport screening search is admissible in court. Nothing we say today is to the contrary.

(quoting *Davis,* 482 F.2d at 905).[8]

We conclude, therefore, that the airport search established by the record in this case cannot be justified by consent. Nor are the exceptions to the warrant requirement established for exigent circumstances, inventory searches or border searches applicable. *See generally* Note, *The Constitutionality of Airport Searches,* 72 Mich.L.Rev. 128 (1973).

C. Campbell raises a series of other objections to the procedures employed by the United States Customs Service in this case. He claims, for example, that his detention by customs agents at LAX violated the guidelines established by *United States v. Place,* 462 U.S. 696, 103 S.Ct. 2637, 77 L.Ed.2d 110 (1983), and that the procedure for determining that the currency was used in connection with drug transactions was flawed. One or more of these contentions may well have merit.[9] As we have re-

solved this case on other grounds, we need not reach these issues. Although we have serious doubt about the district court's ruling on the matter, we also need not reach Campbell's argument that there was not sufficient evidence to sustain a judgment of forfeiture.

### Conclusion

The order denying the motion to suppress is reversed. The order of forfeiture is vacated and the case is remanded for further proceedings consistent with this opinion.

---

**8.** The true voluntariness of an airport search is doubtful in any event. As one commentator noted:

> A passenger is not, of course, compelled to travel by airplane, but many travelers would reasonably conclude that they had no realistic alternative. Instead of justifying passenger searches as consensual, we should candidly acknowledge the element of coercion and seek a rationale which justifies them, coercion notwithstanding.

Wright, *Hijacking Risks and Airport Frisks: Reconciling Airline Security with the Fourth Amendment,* 9 Crim.L.Bull. 491, 499–500 (1973). We have held that the "exercise of the constitutional right to travel may not be conditioned upon the relinquishment of another constitutional right (here, the Fourth Amendment right to be free of unreasonable search), absent a compelling state interest." *Davis,* 482 F.2d at 913. Because some compelling state interest must exist before the government can burden the constitutional right to travel, airport searches cannot be justified by consent alone. "At the minimum, governmental restrictions upon freedom to travel are to be weighed against the necessity advanced to justify them, and a restriction that burdens the right to travel 'too broadly and indiscriminately' cannot be sustained." *Id.* at 912.

**9.** We are particularly troubled by Campbell's claim under *Place. Place* held that detention of defendant's luggage for 90 minutes without probable cause was unreasonable. Although declining to specify the maximum appropriate length of time for a detention, *Place* indicated that courts should take into account "whether the police diligently pursue[d] their investiga-

tion." *Place,* 462 U.S. at 709, 103 S.Ct. at 2645. Furthermore, the Court noted that agents should "accurately inform [defendant] of the place to which they were transporting his luggage, of the length of time he might be dispossessed, and of what arrangements would be made for return of the luggage if the investigation dispelled the suspicion." *Id.* at 710, 103 S.Ct. at 2646.

In this case, DEA agents did not abide by the guidelines laid down in *Place.* Rather than informing Campbell of the length of time he would be dispossessed or making arrangements for return of the suitcase, they merely informed him that they would detain his briefcase pending further investigation. Nor were the agents diligent in pursuing their investigation so as to limit the length of detention: Although the agents planned to hold on to the money until it could be sniffed by a trained narcotics detecting dog, they had made no arrangements to obtain a dog prior to seizing Campbell's briefcase, and in fact no dog was available until the following day. Under these circumstances, the seizure of Campbell's luggage appears to have exceeded the "narrow authority possessed by police to detain briefly luggage reasonably suspected to contain narcotics." *Place,* 462 U.S. at 710, 103 S.Ct. at 2646. *See also United States v. Erwin,* 803 F.2d 1505, 1509 (9th Cir.1986) (officials had abided by the *Place* guidelines where they informed defendant of reason his pack was being seized and procedure they planned to follow; made arrangements for the possible return of the pack; and allowed only 45 minutes to elapse between time defendant stepped off the plane and time of dog-sniff test).