**S. Myron KLARFELD, Plaintiff–Appellant,**

v.

**UNITED STATES of America; United States District Court; United States Marshal, Defendants–Appellees.**

No. 89–56315.

United States Court of Appeals, Ninth Circuit.

April 20, 1992.

As Amended May 6 and May 20, 1992.

S. Myron Klarfeld, San Diego, Cal., for plaintiff-appellant.

James R. Sullivan, Asst. U.S. Atty., Los Angeles, Cal., for defendants-appellees.

Before: BROWNING, PREGERSON, and LEAVY, Circuit Judges.

KOZINSKI, Circuit Judge, with whom Circuit Judges ALARCON, POOLE, HALL, WIGGINS, BRUNETTI, THOMPSON, O'SCANNLAIN, TROTT, T.G. NELSON, and KLEINFELD join, dissent from this order.

KOZINSKI, Circuit Judge, with whom Circuit Judges ALARCON, POOLE, HALL, WIGGINS, BRUNETTI, THOMPSON, O'SCANNLAIN, TROTT, T.G. NELSON and KLEINFELD join, dissenting from the denial of rehearing en banc.

The opinion in this case gives everyone who passes through a security checkpoint the right to haggle about how the screening will be conducted—down to picayune details like whether his shoes will be X-rayed—and to sue in federal court if he doesn't like the bargain. This ruling conflicts with our precedents, not to mention simple common sense. It cheapens the important values of the Fourth Amendment. It holds judges and lawyers up to public ridicule. And it will surely interfere with the orderly conduct of the many thousands of security screenings that take place in the Ninth Circuit every day.

I

The United States courthouse in downtown Los Angeles, like all government buildings nowadays, is considered at risk of terrorist attack. To stem the flow of ordnance into the halls of justice, the United States Marshals Service operates a security checkpoint much like those seen at airports and other government buildings around the country: All visitors must pass through a metal detector and submit their belongings to an X-ray scan before they will be admitted into the building.

S. Myron Klarfeld is a lawyer who had business in that very courthouse. He placed his change and keys in a basket, but the alarm sounded as he passed through the metal detector. He removed a small knife from his pocket, but the alarm sounded again. The court security officer then asked him to remove his belt and shoes and walk through the detector a third time. Klarfeld objected and asked to be scanned with a hand-held magnetometer instead. The officer declined, giving Klarfeld a perfectly plausible explanation: The shoes would have to be X-rayed because "[y]ou could have a gun there." Klarfeld grudgingly complied and walked through the metal detector in his stocking feet. This time the alarm remained silent; the X-ray machine revealed that a metal shank in Klarfeld's Brooks Brothers loafers had triggered the alarm.

Once inside, Klarfeld wrote a note complaining that he had had to walk in his stocking feet to enter the building and asked that it be delivered to Chief Judge Manuel L. Real, who was busy instructing a jury. When he received no response, still less an apology, Klarfeld sued the United States, along with the United States District Court and the United States Marshal. He alleged that his constitutional rights had been violated because he was forced to

walk through the metal detector in his socks.

The district court did the only sensible thing it could under the circumstances: It dismissed the complaint for failure to state a claim. We reversed. Although the panel recognized that administrative searches are permissible under the Fourth Amendment, it held that Klarfeld may have suffered a constitutional injury because the guards might have figured out a way of screening him without having him take off his shoes. Judge Pregerson concurred, arguing that, as an attorney, Klarfeld was constitutionally entitled to enter the courthouse with his bar card and a photo ID. As the accompanying order explains, a call for a vote to take this case en banc was unsuccessful. I write to explain that the vote was in error because this case deserves serious reconsideration.

## II

No one goes through security checkpoints for the pleasure of it. It's intrusive. It may force you to come into physical contact with perfect strangers. It delays your progress toward your destination. It's a bother. It's a nuisance. It's a pain in the neck. But most people put up with it without complaint because they understand that security screenings serve an important purpose: safeguarding us all from armed attack. At airports alone, over a billion screenings—four for every man, woman and child in the United States—are conducted each year. See *United States v. $124,570 U.S. Currency (Campbell)*, 873 F.2d 1240, 1242 (9th Cir.1989). Although such screenings can be inconvenient, we all feel a good deal more secure knowing that our fellow airline passengers aren't carrying guns, knives and bombs.

Courthouses also routinely screen visitors, and for good reason. As the Director of the U.S. Marshals Service has recognized, "[t]he very nature of judicial proceedings creates a volatile and potentially dangerous environment." *The Director's Report: A Review of the United States Marshals Service in FY 1990* 42 (1991).

In FY 1990, [Court Security Officers] detected 137,820 concealed weapons (10,-809 of which were confiscated) that individuals were attempting to bring into U.S. courthouses. Thirty-seven percent of the weapons detected (50,757) were firearms. Additionally, CSOs confiscated 1,415 pieces of contraband items which could have been used as weapons (e.g., 5–inch safety pins, ice picks, hacksaw blades).

*Id.* at 43. The deterrent effect of metal detectors has reduced the number of guns intercepted at the downtown Los Angeles district court from three or four a month to nearly zero—although officers still recover "a multitude of different types of knives." LA Times B1 (Feb. 1, 1988).

We have repeatedly approved these screenings. See, e.g., *McMorris v. Alioto*, 567 F.2d 897, 900 (9th Cir.1978); *United States v. Davis*, 482 F.2d 893, 908–12 (9th Cir.1973). We have also recognized, however, that security checks pose serious threats to civil liberties if they are used as tools for law enforcement. See *Davis*, 482 F.2d at 910–12. Where security officers look to considerations other than safety in conducting the screening, such as when they are on the lookout for evidence of drug trafficking, the search loses its protected character. *Campbell*, 873 F.2d at 1243.

The security check here fell squarely within our guidelines for administrative searches as announced in *Davis*, *McMorris* and subsequent cases. There was no suggestion that the officers were looking for contraband or doing anything other than screening for weapons. Indeed, when Klarfeld objected to taking his shoes off and placing them on a conveyor belt, the guards gave him an explanation: "You could have a gun there." This is not an idle fear: The FBI recently issued an alert, complete with photographs, titled "Loaded Shoes":

Deputies in the Davidson County Sheriff's Office in Nashville, Tennessee, found this handgun [pictured] concealed in a pair of tennis shoes. They confiscated the weapon from a suspect being

processed into a corrections facility. The suspect hollowed out a section of both soles. In one shoe, he concealed the frame of a dismantled .22–caliber handgun. The other shoe contained the loaded cylinder housing. The suspect then resealed the tread of both shoes to avoid detection.

FBI, *Law Enforcement Bulletin* 26 (April 1992) (the photographs are reprinted as an appendix to this opinion).[1] Klarfeld, in fact, does not challenge the need for security screening, or claim it is a subterfuge.

What then is the problem? Klarfeld complains that "compelling him to take off his shoes (and/or belt) to gain entrance to the court" violates the Constitution because the guards could have used less intrusive methods to find out whether he had a gun hidden there. The panel agreed, holding that "[a] method of search which exposes the person searched to substantial embarrassment could well be more intrusive than the search approved in *McMorris* and may rise to the level of a fourth amendment violation." 944 F.2d 583, 587 (9th Cir.1991). The panel does not explain why asking Klarfeld to walk in his socks is more intrusive than the pat-down searches we approved in *McMorris*. If courthouse visitors may be subjected to *that* ordeal as a condition for coming into the building, Klarfeld can have no legitimate complaint about being asked to walk 5 or 6 feet without his shoes.[2]

Klarfeld's complaint, however, turns not on the objective intrusiveness of the screening, but on the guard's refusal to tailor it to comport with Klarfeld's personal preferences—"that he would rather be searched by the hand metal detector than to take off his shoes." By upholding Klarfeld's claim, the panel gives everyone who walks through a magnetometer a constitutional right to choose what particular screening method he would "rather" be subjected to. Klarfeld believed that walking through the magnetometer in his stocking feet was beneath his dignity and requested to be scanned with a hand-held metal detector. Someone else might feel that being frisked with a hand-held detector would be more demeaning, and insist on the stocking-feet method. And still someone else might think that a pat-down search is best of all. Are security officers required—as a matter of *constitutional* law—to weigh the preferences and sensibilities of every one of the billion-plus people screened every year? If so, how do security officers figure out whether the individual's preferred method is equally effective in detecting weapons?

The problem is far from academic, as this case demonstrates. The panel seems to accept the notion that a hand-held magnetometer is, indeed, an adequate substitute for the screening actually conducted. 944 F.2d at 586 (majority); *id.* at 588 (concurrence). But stop to think about it: A hand-held magnetometer is not a small X-ray machine; it's a small metal detector. It may be an adequate substitute for the walk-through metal detector, which Klarfeld had already flunked twice; at most it could tell the security officers that Klarfeld had enough metal concealed in his shoes that he might pose a threat to courthouse security. The suspicion that "[y]ou could have a gun there" would still exist—indeed it would be made stronger—and no amount of prodding and poking with the metal de-

---

1. The Nashville incident is not unique. Last year, two IRA prisoners took a prison guard hostage and escaped, thanks to a gun hidden in a shoe. Sunday Times (Aug. 11, 1991). In 1988, a Kuwaiti airliner was hijacked when terrorist walked on board with guns in their shoes. The Independent 10 (May 28, 1991). And in 1983, a convicted murderer held a Pennsylvania prison guard hostage for five days after the guard discovered .22–caliber pistols hidden in the prisoner's shoes. UPI Wire Report (Dec. 14, 1983).

2. Even if the stocking-feet method *were* more intrusive than other available methods, that

alone would not make it constitutionally suspect, as the Supreme Court has explained in a closely related context: "The reasonableness of the officer's decision to stop a suspect does not turn on the availability of less intrusive investigatory techniques. Such a rule would unduly hamper the police's ability to make swift, on-the-spot decisions ... and it would require courts to indulge in unrealistic second-guessing." *United States v. Sokolow*, 490 U.S. 1, 11, 109 S.Ct. 1581, 1587, 104 L.Ed.2d 1 (1989) (internal quotations omitted).

tector could have eliminated the risk that the concealed metal was a gun. The only way to do that was to put the shoes through the X-ray machine to get a look at the piece of metal. So we'd be right back where we started—except it would have taken longer and Klarfeld would have had to stand still for a hand-held magnetometer scan in addition to everything else.

If my colleagues misunderstood this point, how can we expect security officers to make spot judgments on questions such as these all day long? What, for example, are guards supposed to do when an alarm is set off by "[m]etal braids that women use to hold up 'big' hairdos," Crains Cleveland Bus. 19 (Nov. 25, 1991), or by dental plates, as happened to Chief Judge Thomas A. Wiseman of the Middle District of Tennessee when he tried to enter his own courthouse? Nat'l L.J. 39 (Aug. 14, 1989). What about the case where a metal pin in someone's leg triggers the alarm, as happened to quarterback-turned-sportscaster Joe Theismann when he tried to enter last year's Super Bowl stadium? NY Times 46 (Jan. 26, 1991). Or when a metal clothes hanger, on which someone is carrying a change of clothes, proves troublesome, as happened to talk-show host Geraldo Rivera on the way into his own show? UPI Wire Report (Aug. 19, 1987). There are several reasonable ways of dealing with each of these situations and the millions more that arise daily; every one of the individuals involved could claim that his way of conducting the screening would have been preferable. Should the guards have scanned Chief Judge Wiseman's mouth with a metal detector instead of asking him to remove his dental work? Should a guard insist that earrings be removed? [3] Under the panel's rationale, security guards will have to make spot judgments about whether to follow prescribed procedures or deviate from them to accommodate a particular individual's expressed preferences.

Proper security procedures and constitutional requirements call for a minimum of flexibility and judgment to be exercised on the part of the examining officers. Giving security officers firm and inflexible instructions avoids the types of mistakes that can prove deadly when officers are confronted with a determined and clever terrorist. And the less flexibility individual officers have in conducting security screenings, the less likely they are to exercise their authority in an arbitrary fashion. Inflexibility and singularity of purpose are the hallmarks of administrative searches. See *Campbell*, 873 F.2d at 1244-45. It is the reason we allow such screenings to take place without the use of a warrant. Yet the panel here holds that the United States

---

3. The case of the earrings illustrates both how incensed individuals can become about security screenings, and how difficult are the judgments security personnel must make in preserving our safety. Guards at National Airport refused to let a woman through a security checkpoint—where she had set off the alarm three times—until she removed her large metal earrings. "'They're earrings!' the woman shouts. 'Just little pieces of metal! They have nothing to do with the security of the plane!'" Wash.Post E4 (July 28, 1989). A local columnist took up her cause:

> [E]arrings were the culprit here. The guards knew it. The woman knew it. Why treat her like a terrorist? The purpose of airport security is protection, not humiliation, and the security system had already served up all the protection you could ever want.

*Id.* That's one legitimate point of view, but here's another:

> Security personnel do not "know" and cannot rely on the woman's claim that her earrings were the sole cause of the metal-detector alarm. The consequences could be tragic if, in addition to earrings, the passenger had been wearing a small automatic pistol under her clothing to be used by her or passed to a confederate during the flight.
>
> The request to remove earrings to permit detection of metallic contraband is less humiliating than requesting a passenger to step to the side for "frisking" by a hand-held detector. In these unfortunate times of explosive-filled radios, common sense dictates compliance with—not resistance to—such reasonable requests; the conscientious security personnel at National should be commended, not criticized.

Wash. Post A15 (Aug. 5, 1989) (letter to the editor). Under the panel's decision the federal courts will become arbiters of disputes such as these. I doubt safety will be enhanced by forcing security guards to make such judgments under pressure, knowing that a federal judge or jury, with the benefits of hindsight and plenty of leisure time, could come to a different conclusion.

might be liable precisely because security officers lacked flexibility.[4]

The panel also raises to constitutional status Klarfeld's complaint that his shoeless passage through the metal detector redounded "to the amusement of the guard and onlookers." But Klarfeld has not alleged that he was singled out for this treatment; he does not say that the guards made him walk in his stocking feet because they disliked him or wanted to make fun of him. Is a particular individual's subjective perception that some aspect of a routine security check is demeaning or exposes him to ridicule a sufficient basis for holding that he is constitutionally entitled to an alternative? The panel's affirmative answer stands in sharp contrast to the Supreme Court's observation that "[the] 'reasonable person' standard ... ensures that the scope of Fourth Amendment protection does not vary with the state of mind of the particular individual being approached." *Michigan v. Chesternut*, 486 U.S. 567, 574, 108 S.Ct. 1975, 1980, 100 L.Ed.2d 565 (1988).

I can certainly see this particular gambit being played both ways. Let's suppose the security officers had done what Klarfeld wanted—frisked him with a hand-held magnetometer—but he had said, "No, I'd rather walk through the big metal detector in my stocking feet." His claim then would be that forcing him to stand there while a guard poked at his body with a large metal object made him the butt of snickers from the guards and onlookers. Because security screenings are always intrusive, we all feel somewhat sensitive and exposed in going through them. But there is reassurance in the fact that we get treated just like everyone else; if we are made to walk in stocking feet through the metal detector, others similarly situated will be too, so that what might be funny once becomes a shared inconvenience that evokes sympathy rather than amusement.

Insofar as the record discloses, Klarfeld was treated just like everyone who still set off the metal detector after emptying his pockets. Klarfeld's snobbish complaint is that he was constitutionally entitled to *better* treatment than everyone else, just because he is a lawyer; one member of the panel agreed. 944 F.2d at 588 (Pregerson, J., concurring). Yet even if the U.S. Marshal could make such a distinction as a matter of safety, wouldn't he be justified in treating all members of the public the same so as not to make some visitors to our courthouses feel like second-class citizens? Few people visit courthouses for fun; generally, they go there for serious business: to be jurors, or witnesses, or parties to a lawsuit, or perhaps to be admitted to citizenship. Is their business before the court less important than that of lawyers? Or are lawyers constitutionally entitled to superior treatment because they come from the same social stratum as judges?

Finally, a word about the interest Klarfeld asserts under the Fourth Amendment—the right not to walk in his stocking feet through a metal detector. It does not involve disclosure of private facts; it does not give government officials a chance to discover contraband; it does not give authorities an opportunity to paw through anyone's personal effects. In short, none of the concerns normally associated with the Fourth Amendment is implicated. While Klarfeld claims an interest in more dignified treatment, there is nothing inherently more dignified about the procedure he proposes than about the one adopted by the security personnel.

What Klarfeld is really after is to do it *his* way: He asserts a constitutional right to set the terms and conditions of the security screening to which he will be subjected, and to force court security officers to make an instant judgment as to whether the procedure he proposes is adequate. But if Klarfeld is entitled to such individualized treatment, surely everyone else is also. The billion-plus security checks conducted in the United States every year will turn into potential dickering contests, as

---

**4.** Klarfeld sought only injunctive relief, but nothing in the panel's opinion precludes a monetary award in future cases—or in this one, if Klarfeld seeks and obtains leave to amend his complaint on remand.

every airline passenger, every visitor to a government building, can hold up the line while he negotiates what procedures he personally finds least offensive, making the guards choose between letting someone who might be carrying a weapon board a plane and finding themselves on the business end of a lawsuit brought by the Mr. Klarfelds of the world.[5]

### Conclusion

The panel in this case appears to have forgotten Judge Kennedy's gentle admonition: "The serenity of the court of appeals is not so debilitating that we fail to appreciate the real dangers posed by threats of violence directed at other courthouses and government facilities." *McMorris*, 567 F.2d at 900. Its opinion is an open invitation to harassment lawsuits by those unhappy with having to pass through security checkpoints—which is just about everyone. It conflicts with our earlier cases, such as *Davis, Campbell* and, particularly, *McMor-*

*ris.* It trivializes the important values of the Fourth Amendment and rewards effete prissiness. It's a slap in the face to the men and women who work diligently to guard the safety of everyone who uses our courthouses and other federal buildings. Although lawsuits asserting violations of civil liberties are to be commended when they challenge governmental tyranny, when a case rests on such a catchpenny constitutional foundation it undermines public confidence in the court and its officers, as evidenced by the reaction of one citizen to Klarfeld's lawsuit:

> Is it any wonder that our legal system continues to hurtle out of control (and lose public respect) if lawsuits like Klarfeld's are taken seriously—indeed, are celebrated as a vindication of important constitutional rights?

LA Times B2 (Dec. 22, 1991). This is a question we might all do well to stop and ask ourselves.

**5.** Although the panel's opinion was written in the context of an administrative search, its rationale is not so easily cabined. Much of what law enforcement officers are required to do is unpleasant to those to whom it is done. A constitutional rule that gives the subject of police conduct a choice as to what procedure he personally finds least offensive could lead to interesting results in a variety of contexts: I would rather be frisked leaning against a police car than lying on the cold, hard ground; I would prefer to wear handcuffs in front rather than behind my back; I would prefer to be questioned while sitting in my car rather than stepping outside. None of these claims seems any more piffling than Klarfeld's; if Klarfeld is constitutionally entitled to take his pick, why not these others as well?

Courtesy David Warren, Davidson County, Tennessee, Sheriff's Office.

Courtesy David Warren, Davidson County, Tennessee, Sheriff's Office.