UNITED STATES COURT OF APPEALS
 FOR THE FIRST CIRCUIT
 

No. 92-2171

 UNITED STATES,

 Plaintiff, Appellant,

 v.

 MARIA E. DE LOS SANTOS FERRER,

 Defendant, Appellee.

 

 APPEAL FROM THE UNITED STATES DISTRICT COURT

 FOR THE DISTRICT OF PUERTO RICO

 [Hon. Raymond L. Acosta, U.S. District Judge]
 

 

 Before

 Selya, Circuit Judge,
 
 Coffin, Senior Circuit Judge,
 
 and Boudin, Circuit Judge.
 

 

Vicki Marani, Attorney, United States Department of Justice, with
 
whom Daniel F. Lopez-Romo, United States Attorney, and Antonio R.
 
Bazan, Assistant United States Attorney, were on brief for appellant.
 
Frank D. Inserni, by appointment of the Court, for appellee.
 

 

 July 15, 1993
 

 BOUDIN, Circuit Judge. Based on evidence obtained
 

through a warrantless search of airport luggage, Maria De Los

Santos Ferrer was indicted for possession with intent to

distribute twenty kilograms of cocaine, 21 U.S.C. 

841(a)(1), and its possession on board an aircraft departing

from the United States, 21 U.S.C. 955. De Los Santos

Ferrer filed a motion to suppress the evidence which the

district court granted. The government appeals the

suppression order. We reverse.

 On March 26, 1991, Customs agents at the Luis Munoz

Marin International Airport in Puerto Rico were conducting a

training exercise with a certified drug-sniffing canine when

the dog alerted on three checked suitcases that had not been

planted by the agents. The suitcases were intermingled with

domestic and international luggage in a baggage area

underneath the American Airlines terminal. The Customs

agents removed the suitcases from the baggage area and ran

them through an airport x-ray machine. In the meantime the

suitcases were identified as registered to a "Maria Torres"

seated on board an American Airlines flight about to depart

for Miami. 

 Customs Agent Marilyn Garcia boarded the plane and

proceeded to the seat assigned to Maria Torres. The seat was

occupied by a man and sitting next to him was the defendant,

Maria De Los Santos Ferrer. Garcia approached the couple,

 -2-

identified herself as a Customs officer, and asked to see

their airline tickets. The couple explained that they were

married and produced airline tickets registered to "Anibal

Torres" and "Maria Torres." De Los Santos Ferrer identified

herself as Maria Torres. Affixed to her airline ticket were

three baggage claim checks that corresponded to the claim

checks on the suitcases picked out by the drug-detecting dog.

The defendant and her husband were led off the airplane and

taken to the Customs enclosure area, where they were put in

separate rooms.

 After the defendant was read her Miranda rights and
 

patted down for weapons, Customs supervisor Benjamin Garcia

asked De Los Santos Ferrer about the suitcases. The

defendant replied that the luggage did not belong to her. An

hour or more elapsed before Agent Enrique Nieves of the Drug

Enforcement Administration arrived. He informed the

defendant that a Customs dog had alerted authorities to the

suitcases checked under her name, that the luggage had been

X-rayed and that the X-ray revealed packages which Nieves

believed contained narcotics.

 Agent Nieves then asked for defendant's permission to

open the suitcases, stating that he would obtain a search

warrant if she did not consent. De Los Santos Ferrer again

denied ownership, telling Agent Nieves that she could not

consent to a search because the luggage was not hers. Nieves

 -3-

continued to seek the defendant's consent. This time

(according to Nieves) she nodded her head in an affirmative

manner. The luggage was then opened and found to contain

cocaine, and the defendant was formally arrested.

 De Los Santos Ferrer was indicted and thereafter she

moved to suppress as evidence the cocaine found in the

luggage. At a hearing on the motion before a magistrate

judge, De Los Santos Ferrer admitted in her testimony that

the suitcases belonged to her. She also agreed that she had

disclaimed ownership of the luggage when questioned by Agent

Benjamin Garcia and then again when questioned by Agent

Nieves. But she denied that she ever consented to a search

of the luggage. She testified that when the luggage was

opened, Nieves did so using a tool. 

 The magistrate judge credited Agent Nieves' testimony on

the issue of consent. The magistrate judge found that the

defendant had voluntarily agreed to the opening of the

suitcases, and he issued a written report to the district

court recommending that the motion to suppress be denied.

The defendant then sought review of the magistrate judge's

recommended report. Based on the record of the earlier

hearing, the district court reversed and ordered suppression

of the cocaine seized from the luggage on two principal

grounds.

 -4-

 First, the district court ruled that the x-ray

examination, conducted for criminal investigation purposes

without a warrant, violated the Fourth Amendment, and its use

to secure consent vitiated the consent. Second, the court

found that the disclaimer and the consent were involuntary

because they were secured in a custodial "stationhouse"

atmosphere in which the defendant was "detained for over an

hour, not free to leave at will and subjected to a frisk" and

to repeated interrogation. The court also criticized the

agents for a pattern of abusive behavior in conducting

warrantless airport searches based on x-ray checks and

alleged consent.

 In this appeal, the government primarily argues that the

x-ray scan was not a search subject to the warrant

requirement. It concedes that this x-ray examination was not

a valid airport administrative search, United States v.
 

$124,570 U.S. Currency, 873 F.2d 1240, 1244 (9th Cir. 1989)
 

(airport administrative search exception to warrant

requirement is limited to searches for weapons and

explosives), but it maintains that there is no reasonable

expectation of privacy in luggage checked at an airport, at

least as to x-ray searches. See Katz v. United States, 389
 

U.S. 347, 361 (1967) (Harlan, J., concurring). The

government notes that luggage on the flight at issue in this

 -5-

case was also subject to an administrative search by the

Agriculture Department.

 We think that the Fourth Amendment issue is a difficult

one. To be sure, a traveler who has any experience knows

that luggage at airports is now commonly x-rayed for guns or

explosives and that requests at the checkpoint to open the

luggage are not uncommon. At the same time, these are

administrative searches conducted for a limited purpose and

this limited--and exigent--purpose has been the basis for

allowing the searches en masse, without a warrant and without

probable cause. There is at least some basis for concern

about the government's falling-domino approach, by which each

intrusion diminishes privacy expectations enough to permit a

further infringement. See Smith v. Maryland, 442 U.S. 735,
 

740 n.5 (1979).

 In this case, the second search was by x-ray and

probable cause to secure a warrant happened to exist; but it

is not clear whether the government's diminished expectations

theory would be limited to probable cause cases or, perhaps,

even to x-ray searches. The government itself ought to give

some thought to the fact that indiscriminate extensions of

warrantless search authority may eventually undermine the

case for legitimate exceptions. In all events, we see no

reason to hurry to embrace the position urged by the

government in this case, for we think that the search may be

 -6-

sustained on a quite different ground, namely, the

defendant's own admitted disclaimer of an interest in the

luggage. See United States v. Maldonado-Espinosa, 968 F.2d
 

101, 103-04 (1st Cir. 1992), cert. denied, 113 S.Ct. 1579
 

(1993).

 It is well established that one who abandons or

disclaims ownership of an item forfeits any claim of privacy

in its contents, and that as to that person the police may

search the item without a warrant. E.g., United States v.
 

Miller, 589 F.2d 1117, 1131 (1st Cir. 1978), cert. denied,
 

440 U.S. 958 (1979); United States v. Torres, 949 F.2d 606,
 

608 (2d Cir. 1991) (collecting cases). In this case,

defendant's own testimony at the hearing was that from the

outset, and repeatedly, she told the agents that she could

not give them authority to open the luggage because it was

not hers. It would be hard to find a more explicit

disclaimer or one more certain to have occurred.

 The district court noted that Agent Nieves did not rely

on the disclaimer but rather continued to seek the

defendant's consent to open the luggage. But there is no

suggestion in the case law that law enforcement officials

must actually believe a defendant who denies ownership, and

indeed it is often the case that the disclaimer is

immediately suspect. E.g., United States v. Roman, 849 F.2d
 

920 (5th Cir. 1988) (agent saw defendant in possession of

 -7-

luggage prior to defendant's disclaimer of knowledge of

bags); United States v. Tolbert, 692 F.2d 1041 (6th Cir.
 

1982) (same), cert. denied, 464 U.S. 933 (1983). Obviously
 

the agent would prefer to have "consent" since it carries

with it an admission of control or ownership that could be

useful at trial; but the agent's attempt to secure this more

useful ground for the search (consent) does not seem to us to

preclude reliance upon an equally well established one

(disclaimer) made out by the facts.

 Nor do we think that the disclaimer is undermined by the

"nod" that defendant is alleged to have given--she denied it

but the magistrate judge found that it had occurred--at the

end of the interview. It may well be that, if a defendant

disclaims ownership of a bag but then clearly reverses ground

and asserts ownership, it is too late for the officer then to

search the bag in reliance on the earlier, but now withdrawn,

disclaimer of ownership. But in this case we do not think

the simple nod, even if it occurred, was sufficiently at odds

with the repeated disclaimer to require us to ignore the

disclaimer.

 Given the original disclaimer, it is unnecessary for us

to rule on the government's argument that the later consent

was voluntary, although we note that district court findings

on such issues are not lightly set aside. The initial

disclaimer is another matter: It occurred at the outset of

 -8-

the questioning well before Agent Nieves even arrived and

before much time had passed. Assuming that the atmosphere

became coercively oppressive, we see no evidence that this

was so at the very outset. If the district court did mean

that this disclaimer was secured by undue pressure, we cannot

sustain that ruling.

 Similarly, the allegedly unlawful x-ray had not been

mentioned when the disclaimer was first made so there is no

argument that it prompted, and thereby infected, the

disclaimer. Nor is there any basis for believing that the x-

ray was a but-for cause of the detention and that the

detention would not have occurred without the x-ray search.

The dog sniff, which is not itself a search, was lawful,

United States v. Place, 462 U.S. 696, 707 (1983), and the
 

"alert"--by a certified, narcotics-detecting dog--provided

probable cause to detain and ample incentive to question the

holder of the claim checks for the luggage. E.g., United
 

States v. Race, 529 F.2d 12, 15 (1st Cir. 1976).
 

 We have considered sua sponte whether Murray v. United
 

States, 487 U.S. 533 (1988), warrants a remand for an
 

evidentiary hearing on the causation issue. In Murray, the
 

Supreme Court required such a hearing because the known facts

left it in doubt whether a warrant-based search of a

warehouse would have occurred without a prior unlawful search

of the same facility by the same agents. In this case, the

 -9-

officer who made the decision to detain the defendant

testified that she did not even know that an x-ray search had

been performed when she took the defendant from the plane.

That detention, the officer testified, was based upon the dog

alert and match-up of claim check numbers.

 Even without that testimony, we think that defendant's

detention here was, beyond any reasonable dispute, inevitable

regardless of the x-ray. The evidence was that the dog, who

had worked with its handler for several years, "was biting

and scratching on these suitcases" associated with the

defendant. This, the handling officer testified, was the

expected response when narcotics were present. According to

the magistrate's report, the agents were in the process of

determining the identity and location of the owner of the

luggage at the same time the luggage was being x-rayed. The

defendant, they learned, was on an airplane ready to depart

from Puerto Rico. Without immediate action to detain her,

the agents could fairly assume that she would be gone from

the jurisdiction. If the x-ray machine had been out of

order, the outcome would have been identical. 

 Finally, we note that the district court was disturbed

at a pattern it perceived of Customs and DEA conduct at the

airport: of dog sniffs, followed by x-rays, followed by

alleged consents to search. See, e.g., United States v.
 

Maldonado-Espinosa, 767 F. Supp. 1176 (D.P.R. 1991), aff'd,
 

 -10-

968 F.2d 101 (1st Cir. 1992). The district court underscored

its unhappiness with this pattern of conduct, discussing it

both at the beginning and the end of the opinion. So far as

concerns the warrantless x-ray search for criminal

enforcement purposes, we have expressed our doubts and

declined in this case to adopt the government's position. 

 The pattern of alleged consents presents a quite

different issue. While we appreciate the value of a probable

cause decision by an independent magistrate, true consent is

a well- founded basis for a search without a warrant, and the

government is entitled to request consent from a suspect as a

legitimate short cut. At the same time, it is one thing to

request consent and another to seek it over and over again

while--as occurred here--holding a defendant in temporary

detention for well over an hour, with no indication of how

long detention will continue, and with the DEA agent raising

his voice to the detainee to tell her to be "respectful."

When the consent is conveyed by a "nod," its worth is further

diminished. 

 If this is the pattern of consent searches at the

airport, we do not applaud it. More to the point, we think

that the government should appreciate that claims of consent

derived in this fashion are likely to be looked upon with a

jaundiced eye by reviewing courts. If the government exerts

undue pressure or improper means to secure consent, instead

 -11-

of obtaining a warrant as it can easily do, it is going to

lose cases.

 The suppression order is reversed and the case remanded
 

for further proceedings.

 -12-